

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

FILED
✠MAR 2 0 2018
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JOHN DOE, )<br><br>Plaintiff, )<br><br>v. )<br><br>PANGEA EQUITY PARTNERS; PANGEA EQUITY PARTNERS, LP; PANGEA EQUITY PARTNERS II, LP; PANGEA PROPERTIES; PANGEA VENTURES, LLC; PANGEA REAL ESTATE; and PANGEA REAL ESTATE HOLDINGS, LLC, )<br><br>Defendants. ) | 1:18-cv-02022<br>Judge Ruben Castillo<br>Magistrate Judge Mary M. Rowland<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) AND NORTHERN DISTRICT OF ILLINOIS UNITED STATES DISTRICT COURT LOCAL RULE 5.7** |

## COMPLAINT

Plaintiff, the United States of America *ex rel.* John Doe, alleges as its Complaint against Defendants as follows:

### Introduction

1. This is an action to recover damages, treble damages, and penalties on behalf of the United States of America on account of false and fraudulent claims made or caused to be made by Defendants, their agents, subsidiaries, employees, and co-conspirators, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended (the "FCA").

2. As set forth below, Chicago's largest private Section 8 landlord is defrauding the United States by systematically and deliberately charging meaningfully more rent for Section 8 apartments than they charge for comparable apartments rented to other tenants. In this way,

Defendants have amassed millions in illegal profits, and have damaged the Section 8 program along the way by receiving funds to which they were not entitled.

3.      In particular, these violations involve the intentional and systematic submission of false and fraudulent claims for rental subsidies through Defendants' participation as owner and landlord of numerous multi-family residential complexes in the Housing and Urban Development's ("HUD") Section 8 Housing Choice Voucher ("HCV") Program in Chicago, Illinois, Baltimore, Maryland, and Indianapolis, Indiana. *See* 42 U.S.C. § 1437f(o); 24 C.F.R. part 982.

4.      Through this program, the Government provides financial assistance to low-income families, the elderly, and the disabled so they are able to afford decent, safe, and sanitary housing in the private rental market. The Government does this through Congressional funding authorizations, where HUD pays housing subsidies through a local Public Housing Agency ("PHA") to landlords on behalf of eligible Section 8 tenants.

5.      From at least 2012 to present, Defendants falsely certified that the rent they charged and collected for their Section 8 units was "not more than rent charged by the owner for comparable unassisted units in the premises." 24 C.F.R. § 982.507(d). In this way, Defendants violated relevant statutory, regulatory, and contractual requirements and defrauded HUD and the United States of America.

6.      By knowingly and expressly charging more for Section 8 apartments than the law allows, Defendants are intentionally violating HUD regulatory and contractual requirements regarding apartment pricing, and are collecting tens of millions of dollars in rental payments to which they are not entitled.

7.     Until his recent forced resignation, relator John Doe was an associate working for Defendants.  John Doe discovered that Defendants routinely defraud the Chicago Housing Authority ("CHA"), HUD, and the United States Government.  Based on what John Doe has uncovered, Defendants' conduct is at least reckless, but more likely deliberate and/or intentional.

8.     Defendants, who either themselves or through subsidiaries or sister entities, own thousands of Section 8 units in Chicago (and other cities), accomplish this "Reasonable Rent Fraud" in two primary ways.

9.     First, Defendants have an established internal policy that instructs their property managers and leasing agents to quote new Section 8 tenants a monthly rental amount approximately *$150 above* the target rent for a particular unit, while a prospective tenant for a comparable unassisted apartment will not be quoted or charged that higher rental amount.  Then, in documentation submitted to CHA as well as in the subsequent contract entered into with CHA, Defendants falsely certify that the rental amount for that assisted unit is no more than a comparable unassisted unit in the premises.

10.    Second, Defendants allow non-Section 8 tenants (*i.e.*, unassisted tenants) to negotiate downward the monthly target rental amount during rental negotiations.  Section 8 tenants, on the other hand, are not afforded such an opportunity, making their rents higher than non-subsidized tenants' rents for comparable unassisted units.

11.    Despite the disparities in rent created by both varieties of Defendants' Reasonable Rent Fraud, Defendants regularly falsely certified compliance with the statutory, regulatory, and contractual requirements that mandate that Defendants not charge more for Section 8 units than they do for comparable unassisted units in the same premises.

12.     By so certifying, Defendants have knowingly violated a clear and material condition of receiving rental subsidy payments under the Section 8 HCV program, and have knowingly submitted, or caused to be submitted, false or fraudulent claims, resulting in the receipt of tens of millions of dollars of rental payments that would not have been paid to Defendants but for their misconduct.

13.     The FCA provides that any person who knowingly presents, causes to be presented, or conspires to present, a false or fraudulent claim to the United States of America for payment or approval is liable for a civil penalty of between $10,957 and $21,916[1] for each false or fraudulent claim submitted or paid, plus three times the amount of damages sustained by the United States of America from the payment of such fraudulent claims.  The FCA's *Qui Tam* provisions further allow any person having information regarding a false or fraudulent claim against the United States of America to bring an action for himself or herself (as the "relator") and for the United States of America, and to share in any recovery.

14.     Based on these provisions of the FCA, John Doe, as relator and original source, seeks to recover damages, treble damages, and civil penalties arising from false claims made to the United States of America that were knowingly presented or caused to be presented to, and were paid by, the United States of America as a result of the acts of Defendants and their agents, subsidiaries, employees, and co-conspirators.

---

[1]     This range of penalties was set by the Department of Justice and applies to penalties assessed after February 3, 2017 for conduct that occurred after November 2, 2015.  *See* Dep't of Justice, Civil Monetary Penalties Inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133 (Feb. 3, 2017), https://www.gpo.gov/fdsys/pkg/FR-2017-02-03/pdf/2017-01306.pdf, last visited March 18, 2018.

15.     John Doe uncovered Defendants' Reasonable Rent Fraud while conducting a rental pricing analysis after only a few months of employment.  John Doe presented these findings to Defendants' Financial Planning and Analysis team and informed Defendants' CFO of what he discovered.  Defendants did nothing to change their practices.

**Parties**

16.     Relator John Doe is a resident of Illinois.  Until February 16, 2018, John Doe was a management associate for Defendant Pangea Ventures, LLC, when he was abruptly forced to resign.  John Doe has personal knowledge of the facts alleged in this Complaint and is acquainted with Defendants and their business practices.  He worked at Defendants' headquarters located at 640 N. LaSalle Drive, Suite 638, Chicago, IL 60654.

17.     John Doe brings this action for violations of 31 U.S.C. Sections 3729, *et seq.,* on behalf of himself and the United States of America pursuant to 31 U.S.C. Section 3730(b)(1).  The allegations of this action are based upon his personal knowledge, unless otherwise described as being made upon information and belief.

18.     John Doe is the original source of the factual allegations of this Complaint within the meaning of Section 3730(e)(4)(B) of the FCA.  John Doe is a highly educated financial professional with a Bachelor of Science degree in Industrial Engineering and Operations Research from UC Berkley as well as a Masters in Finance Degree from MIT Sloan School of Management.

19.     Upon information and belief, Defendant Pangea Equity Partners is an assumed name of Pangea Ventures, LLC with a principal office for the transaction of business located at 640 N. Lasalle Drive, Suite 638, Chicago, IL 60654.

- 5 -

20.     Upon information and belief, Defendant Pangea Equity Partners, LP is a Delaware limited partnership with a principal office for the transaction of business located at 640 N. Lasalle Drive, Suite 638, Chicago, IL 60654.

21.     Upon information and belief, Defendant Pangea Equity Partners II, LP is a Delaware limited partnership with a principal office for the transaction of business located at 640 N. Lasalle Drive, Suite 638, Chicago, IL 60654.

22.     Upon information and belief, Defendant Pangea Properties is a Maryland corporation, taxed and treated as a private real estate investment trust, with a principal office for the transaction of business located at 640 N. Lasalle Drive, Suite 638, Chicago, IL 60654.

23.     Upon information and belief, Defendant Pangea Ventures, LLC is a Delaware limited liability company with a principal office for the transaction of business located at 640 N. Lasalle Drive, Suite 638, Chicago, IL 60654.

24.     Upon information and belief, Defendant Pangea Real Estate is an assumed name of Pangea Ventures, LLC with a principal office for the transaction of business located at 640 N. Lasalle Drive, Suite 638, Chicago, IL 60654.

25.     Upon information and belief, Defendant Pangea Real Estate Holdings, LLC is a Delaware limited liability company with a principal office for the transaction of business located at 640 N. Lasalle Drive, Suite 638, Chicago, IL 60654.

26.     Defendants are the largest private Section 8 landlord in Chicago.

27.     Although CHA is not a party in this matter, it is the most relevant local PHA in Chicago, Illinois through which HUD funds for the local HCV Section 8 program are administered

and with whom Defendants contract as a participating owner/landlord in the HCV Section 8 program in the City of Chicago.

## Jurisdiction and Venue

28.     Defendants are doing business and are authorized to do business in this District and are subject to this Court's jurisdiction.

29.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. Section 1331 and 31 U.S.C. Section 3732, both of which specifically confer jurisdiction on this Court for actions under the FCA (*i.e.*, under 31 U.S.C. Sections 3729 and 3730).

30.     Venue is proper under 31 U.S.C. Section 3732(a) because Defendants can be found and/or transact business within the Northern District of Illinois, and because violation of 31 U.S.C. Sections 3729 and 3730 alleged in this Complaint occurred within this judicial district. Venue is also proper pursuant to 28 U.S.C. Sections 1391(b) and (c).

## I.     HUD's Housing Choice Voucher Program

31.     HUD distributes Federal funds for the HCV program pursuant to Section 8 of the United States Housing Act of 1937, as amended. *See* 42 U.S.C. § 1437f(o) and 24 C.F.R. part 982. The HCV program provides rental subsidies for apartment units selected by tenants in the private market. In this way, the program assists eligible low income families in obtaining decent, safe, and sanitary housing. The HCV program is administered locally by PHAs, with funds allocated by HUD through annual contributions contracts. *See* 24 C.F.R. Part 982.

32.     The local PHAs remit rental subsidy payments on behalf of eligible tenants to private unit owners in accordance with Housing Assistance Payments ("HAP") contracts, which

are entered into between the PHAs and owners and are executed on forms specified by HUD. *See* 24 C.F.R. § 982.162.

33. The HAP contract defines the legal relationship and the agreement between the owner and the PHA. The HAP contract sets forth, among other things, the amount of the monthly assistance to be paid by the PHA to the owner on the tenant's behalf; the amount of the monthly rent to be paid by the tenant directly to the owner; and the amount of the monthly total rent that the owner is entitled to receive for lease of the dwelling unit. The amount that the tenant pays to the owner for rent is called the tenant portion. The Housing Assistance Payment is the amount paid by the PHA to the owner on behalf of the tenant. The rent to owner, or contract rent, is the full rent an owner receives for the unit leased under the HAP contract. PHAs are obligated to calculate and approve these amounts in accordance with HUD requirements. *See* 24 C.F.R. § 982.451.

34. A PHA may not approve a lease until it determines that the rent to the owner is a "reasonable rent." *See* 24 C.F.R. §982.507. The PHA must also make determinations of reasonable rent before any rent increases, and the PHA may redetermine the reasonable rent at any time. At all times during the assisted tenancy, the rent to owner may not exceed the reasonable rent as most recently determined or redetermined by the PHA. *See* 42 U.S.C. § 1437f(o)(10)(A); *see also* 24 C.F.R. § 982.507.

35. The reasonable rent is determined by the PHA by considering the location, quality, size, unit type, and age of the contract unit, as well as any amenities, housing services, maintenance and utilities to be provided by the owner in accordance with the lease. 24 C.F.R. § 982.507(b).

36.    In addition, the PHA will utilize and consider information provided by the owner in the Request for Tenancy Approval ("RTA") form.[2]  Specifically, Section 12(a) of that form is titled the "Owner's Certifications," and owners with more than four units must list the "most recently leased comparable unassisted units within the premises."[3]

37.    The Owner's Certification section of the RTA states that this information is required because "[t]he program regulation requires the PHA to certify that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units."

38.    Federal regulations and the HAP contract mandate that an owner may not receive more money for a Section 8 unit than it receives for a comparable unassisted unit.

39.    In particular, the relevant regulation provides that an owner, "[b]y accepting each monthly housing assistance payment from the PHA . . . certifies that the rent to owner is not more than the rent charged by the owner for comparable unassisted units in the premises.  The owner must give the PHA information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere."  24 C.F.R. § 982.507(d).

---

[2]    Unless otherwise specified, references to a general "Request for Tenancy Approval form" are to the standard RTA found on HUD's website as form HUD-52517. *See* Request for Tenancy Approval, https://www.hud.gov/sites/documents/DOC_11736.PDF, last visited March 15, 2018.

[3]    Other versions of the RTA form exist, and Defendants' over the years have used different versions of the RTA, as amended by CHA.  Generally, these versions are near identical, but in some instances section numbers may be different.  For example, in one version of an RTA form the Owner's Certification section is Section 12 and in another version it is Section 13.  In either case, the certification itself is the same, but, for the sake of simplicity, in this Compliant all references to that section of an RTA form will be to the generic "Owner's Certification" section.

40.     The standard form HAP contract[4] contains similar language. Specifically, Section 6(d) of Part B of the standard form HAP contract states that, "[d]uring the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere."

41.     Additionally, in Section 8(c) of Part B of the standard form HAP contract, the owner certifies that "[t]he rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises."

42.     Similarly, in Part C of the standard form HAP contract (Tenancy Addendum), Section 4(c)(2) states that, "[d]uring the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed . . . [r]ent charged by the owner for comparable unassisted units in the premises."

II.     **Defendants' Reasonable Rent Fraud**

43.     At all times relevant, CHA, through the receipt of federal funds from HUD, administered the HCV Section 8 program in Chicago, Illinois.

44.     At all times relevant, Defendants, either themselves or through their subsidiaries or sister entities, were owners of numerous multifamily apartment complexes with thousands of Section 8 units within the city of Chicago, and they contracted directly with CHA under the

---

[4]     Unless otherwise specified, references to the "standard form HAP contract" in this Complaint are to the standard HAP contract form found on HUD's website as form HUD-52641. *See* Housing Assistance Payments Contract, https://www.hud.gov/sites/documents/DOC_11737.PDF, last visited March 15, 2018.

- 10 -

Section 8 HCV Program by, among other things, executing and entering into HAP contracts and receiving Section 8 funds from CHA.

45.     As stated above, Defendants engaged in their Reasonable Rent Fraud in two primary ways:  first, they intentionally charged rents to Section 8 tenants above the rents they charged non-Section 8 tenants in comparable units; and second, they allowed non-Section 8 tenants to negotiate downward the rental amount but did not allow for similar negotiated reductions in rent for Section 8 tenants.  In both instances, the result is that the Government pays more for Section 8 tenants than non-Section 8 tenants pay.  This fraud is ongoing.

46.     Despite these deliberate rent differentials, Defendants falsely certify in the RTAs, in the HAP contracts, and through their receipt of monthly subsidy payments, that the rent they charge to a particular Section 8 tenant *does not exceed* rent charged for a comparable unassisted unit in the premises.  The opposite is true.  In this way, Defendants are defrauding the Government.

47.     Beginning no later than 2012, Defendants began committing Reasonable Rent Fraud.  Their first method — misleading the CHA by intentionally quoting (and ultimately charging) rental amounts for Section 8 tenants above target rent and falsely certifying that the proposed rent was no more than the comparable unassisted units in the premises — was Defendants' own stated internal policy.

48.     In particular, Defendants' internal memorandum, titled "CHA Rules to Live By," instructed employees working with Section 8 tenants to list the proposed rent fraudulently on the RTA at "$100-150 above the target rent – NEVER TBD."

49.     As well, Defendants created an internal guide that instructed their employees to lie on the RTA forms.  In particular, for the Owner's Certification section, the instruction was to "[e]nter [the] address, last rented & amount of comparable unit in building that is occupied and

paying the same rent. If there aren't any put unit the voucher holder wants, desired rent amount."
In sum, this instruction means that, if there is no unassisted comparable unit paying the same rent
listed in the proposed rent section of the RTA, the employee is then to list the unit to be leased by
this Section 8 tenant and the rent that has been proposed, and ignore any other unassisted
comparable units that may be paying less. This is exactly what took place.

50.     For example, Section 8 Tenant A rented Chicago apartment 4714 S. Michigan
Avenue, Unit 2E in or about December 2016. This unit is in an apartment building complex with
approximately twenty-four units (some Section 8 and some unassisted) located at 4714 – 4720 S.
Michigan Avenue. The RTA proposed monthly rent for Tenant A was $1,205. In the Owner's
Certification section, Defendants relisted that same unit and listed the same proposed rent while
ignoring a comparable unassisted unit within the premises that had been recently leased at a
lower amount. Had Defendants properly and truthfully prepared the RTA for Tenant A and Unit
2E, they would have listed Unit 3E of 4714 S. Michigan Avenue, which had been leased in or
about November 2016 by a non-Section 8 tenant for $975 per month. Yet Tenant A's rent was
the full $1,205.

51.     Another example of this taking place is Section 8 Tenant B, who rented Chicago
apartment 1105 N. Lawler Avenue, Unit 1 in or about November 2016. Tenant B's proposed rent
in the RTA was $895 per month. In the Owner's Certification section, Defendants listed the
same unit and the same proposed rental amount. Had Defendants properly and truthfully
prepared the RTA for Tenant B and Unit 1, they would have listed Unit 2 of 1105 N. Lawler
Avenue, which had the same lease start date as Unit 1 and was leased to a non-Section 8 tenant
with a lower monthly rent of $829.

52.     A slight variation to this first method of listing the same unit in the Owner's
Certification of the RTA occurred where Defendants would list a comparable unassisted unit in

the building but still list the proposed rent instead of the true rent that the unassisted unit was being charged.

53.     For example, in or about August 2015, Section 8 Tenant C rented Chicago apartment 8308 S. Ingleside Avenue, Unit 1C and the proposed rent listed in the RTA was $710 per month.  In the Owner's Certification section, Unit 2C was listed as the comparable unassisted unit in the premises with a lease start date of July 1, 2014, but Defendants deceptively listed the rental amount for that comparable unit as $710 when, in fact, Unit 2C's rent was only $660 per month.

54.     Another example of this is Section 8 Tenant D, who rented Chicago apartment 10912 S. Vernon Avenue, Unit 1S in or about January 2016.  In Tenant D's RTA, the proposed rent for Unit 1S was $1,135.  The Owner's Certification section listed Unit 2S in that building as the comparable unassisted unit and listed the rental amount for Unit 2S as $1,135.  But the rental amount for Unit 2S was materially false because Unit 2S was actually renting for $815 per month.  Yet Defendants charged Tenant D the full $1,135 monthly rent.

55.     The second way Defendants commit the Reasonable Rent Fraud is by negotiating the target rent downward for non-Section 8 tenants, while not doing the same for Section 8 tenants.

56.     Over the years, and regardless of the fraudulent method used by Defendants, the reality is that both methods of Defendants' Reasonable Rent Fraud have resulted in thousands of false certifications of compliance by Defendants with their regulatory and HAP contract requirements where they falsely certified that they were not charging more to Section 8 tenants than to a non-Section 8 tenant renting a comparable unit.

57.     For instance, Section 8 Tenant E rented Chicago apartment 7622 S. Coles Avenue, Unit 1 in or about November 2013.  The HAP contract, which contains the relevant certifications

- 13 -

regarding rent to owner not exceeding the amount charged for a comparable unassisted unit,
indicates an initial rent of $960 per month for this unit. Despite that certification by Defendants
in the HAP contract, Unit 2 in that building was rented by a non-Section 8 tenant for $810 per
month.

58.    Another example of a clear violation of the terms of the HAP contract are seen in
Section 8 Tenant F's rental of Chicago apartment 5316 W. Washington Boulevard, Unit 2 in or
about October 2013. The monthly rent being charged to Tenant F was $1,080 and the HAP
contract contained the requisite certifications that Defendants were not charging more for this
assisted unit than they were for a comparable unassisted unit. These certifications, however,
were false. In the month prior to Tenant F's lease, Defendants leased Units 1 and 3—comparable
unassisted units in that building—for $930 per month.

59.    At bottom, whether Defendants purposefully quote and charge approximately
$150 more to Section 8 tenants, negotiate downward with non-Section 8 tenants without doing
the same for Section 8 tenants, or otherwise find a way to deliberately charge more to their
Section 8 tenants than to their non-Section 8 tenants renting comparable units, the result is the
same. That is, Defendants routinely charge higher rents to Section 8 tenants than to non-Section
8 tenants renting comparable unassisted units, and Defendants falsely certify to CHA, HUD, and
ultimately the United States of America that they are in compliance with the regulatory and
contractual requirements that Section 8 tenants' rent not exceed rent for comparable unassisted
units.

60.    Neither HUD nor CHA authorized Defendants to charge more for Section 8 rent
than they did for comparable unassisted units.

61.    In fact, CHA relied on Defendants' compliance with their contractual and regulatory certifications and conditions for subsidy payments that they were not charging more to Section 8 tenants.

62.    CHA made monthly payments of federal funds to Defendants based on those certifications, including, upon information and belief, to Defendants in the above referenced examples as well as in thousands of other falsely certified lease arrangements with Section 8 tenants.

63.    Defendants accepted those monthly payments and kept the money without notifying CHA, HUD, or the federal government that they were not in compliance with their contractual and regulatory certifications, nor did Defendants return any money to which they were not entitled due to their misconduct and false certifications.

64.    As is clear from federal regulations and the HAP contracts, acceptance of each monthly housing assistance payment carries with it Defendants' certification that they are not charging more to Section 8 tenants than they are to non-Section 8 tenants in comparable unassisted units.  In particular, "[b]y accepting each monthly housing assistance payment from the PHA, the owner certifies that the rent to owner is not more than rent charged by the owner for comparable unassisted units in the premises."  24 C.F.R. § 982.507(d).

65.    Absent Defendants' materially false certifications and material omissions, CHA would not have made monthly housing assistance payments to Defendants. *See, e.g.*, Standard form HAP contract, Part B, Section 7(b) ("Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.").

66.    Defendants have had, and have, the requisite knowledge of these practices under the FCA, and the fraud is ongoing.

## Count One

### Substantive Violations of the False Claims Act
### [31 U.S.C. §§ 3729(a)(1)(A) and (B)]

67.     John Doe repeats and realleges each allegation of numbered paragraphs 1 through 66 of this Complaint as part of this First Cause of Action.

68.     Defendants, together with their agents, subsidiaries, employees, and co-conspirators, presented and caused to be presented to the United States of America knowingly false and fraudulent claims for payment, made materially false certifications of compliance with statutory, regulatory and contractual requirements that were material conditions to payment, and knowingly created and made false records in connection with such fraudulent and false submissions and certifications.

69.     In addition, Defendants knowingly made, used, and/or caused to be made or used false records and/or statements to conceal and/or avoid detection of their Reasonable Rent Fraud.

70.     As a result of the knowingly false and fraudulent claims submitted or caused to be submitted by Defendants, together with their agents, subsidiaries, employees, and co-conspirators, the United States of America, through HUD and *via* the CHA, paid Defendants rental subsidies to which they were otherwise not entitled.

71.     As a result of Defendants' knowing conduct and fraudulent charging, the United States of America has paid substantial amounts of money, which total, at this time, is unknown but which can be expected to equal or exceed tens of millions of dollars.

72.     As a result of the knowingly fraudulent conduct of Defendants, together with that of their respective agents, subsidiaries, employees, and co-conspirators, Defendants are liable to

the United States of America for the amount of the payments made to them, trebled, plus penalties, interest, and attorneys' fees and expenses under the FCA.

## Count Two

### False Claims and Conspiracy
### [31 U.S.C. § 3729(a)(1)(C)]

73. John Doe repeats and realleges each allegation contained in paragraphs 1 through 72 of this Complaint as part of this Second Cause of Action.

74. Defendants conspired with each other, and their employees, subsidiaries, and agents, to defraud the United States of America by causing false and fraudulent claims to be submitted and by knowingly certifying to material conditions of payment that were completely untrue.

75. In furtherance of the conspiracy, Defendants created false records to substantiate their Reasonable Rent Fraud, and knowingly and falsely certified compliance with their statutory, regulatory, and contractual requirements that were material conditions of payment, all with the intent to defraud the United States of America.

76. Based upon the false and fraudulent claims submitted or caused to be submitted by Defendants, the United States of America paid Defendants sums to which they were not entitled under law.

77. As a result, the United States of America has sustained substantial damages directly related to payments made to Defendants based upon false and fraudulent claims and certifications, and Defendants are therefore liable to the United States of America for the amount of such payments trebled, together with penalties, interest, and the costs of this action, including attorneys' fees and expenses, as provided for by the FCA.

## Jury Demand

John Doe demands a jury on all issues and matters triable by a jury.

## Relief Requested

WHEREFORE, the United States of America *ex rel.* John Doe demands judgment against Defendants as follows:

    a)  On the First Cause of Action, for treble damages under 31 U.S.C. §§ 3729(a)(1)(A) and (B) in an amount to be determined at trial, plus statutory penalties per claim, costs, interest, expenses, and attorneys' fees;

    b)  On the Second Cause of Action, for treble damages under 31 U.S.C. § 3729(a)(1)(C) in an amount to be determined at trial, plus statutory penalties per claim, costs, interest, expenses, and attorneys' fees;

    c)  On the First and Second Causes of Action, for the damages sustained by the United States of America; and

    d)  For award of such other and further relief as this Court deems proper as a matter of law or under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, including fees, costs, and expenses pursuant to Section 3730(d).

Dated:          March 20, 2018

                                            **SCHIFF HARDIN LLP**
                                            *Attorneys for John Doe*

                                            By:  /s/William P. Ziegelmueller

                                            William P. Ziegelmueller
                                            233 South Wacker Drive, Suite 7100
                                            Chicago, Illinois 60606
                                            312.258.5500
                                            *bziegel@schiffhardin.com*

**HODGSON RUSS LLP**
*Attorneys for John Doe*

Daniel C. Oliverio
Robert J. Fluskey
Patrick E. Fitzsimmons
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
716.856.4000
*doliverio@hodgsonruss.com*
*rfluskey@hodgsonruss.com*
*pfitzsimmons@hodgsonruss.com*

Motions for admission to this Court to be
filed on behalf of Hodgson Russ counsel.