UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____

UNITED STATES OF AMERICA,

       *ex rel.*

ANTONI MUHAWI,

                         Plaintiff,

     v.                                Case No.: 18-CV-02022
                                       Hon. Manish S. Shah

PANGEA EQUITY PARTNERS,
PANGEA EQUITY PARTNERS, LP,
PANGEA EQUITY PARTNERS II, LP,
PANGEA PROPERTIES,
PANGEA VENTURES, LLC,
PANGEA REAL ESTATE, and
PANGEA REAL ESTATE HOLDINGS, LLC,

                         Defendants.

_____

## THIRD AMENDED COMPLAINT

    Plaintiff, the United States of America *ex rel.* Antoni Muhawi, alleges as its Third Amended Complaint against Defendants as follows:

## Introduction

    1.    This is an action to recover damages, treble damages, and penalties on behalf of the United States of America on account of false and fraudulent claims made or caused to be made by Defendants, their agents, subsidiaries, employees, and co-conspirators, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended (the "FCA").

- 1 -

2.      As set forth below, Chicago's largest private Section 8 landlord is defrauding the United States by systematically and deliberately charging meaningfully more rent for Section 8 apartments than they charge for comparable apartments rented to non-Section 8 tenants. In this way, Defendants have amassed millions in illegal profits, and have damaged the Section 8 program along the way by receiving funds to which they were not entitled.

3.      In particular, these violations involve the intentional and systematic submission of false and fraudulent claims for rental subsidies through participation as owner and landlord of numerous multi-family residential complexes in the United States Department of Housing and Urban Development's ("HUD") Section 8 Housing Choice Voucher Program ("HCVP") in Chicago, Illinois, Baltimore, Maryland, and Indianapolis, Indiana. *See* 42 U.S.C. § 1437f(o); 24 C.F.R. part 982.

4.      Through this program, the United States Government, through HUD, provides financial assistance to low-income families, the elderly, and the disabled so they are able to afford decent, safe, and sanitary housing in the private rental market. The Government does this through Congressional funding authorizations, where HUD pays housing subsidies through a local Public Housing Agency ("PHA") to landlords on behalf of eligible HCVP tenants.

5.      As a condition of participating in the HCVP, landlords must certify that the rents they charge to assisted tenants are "not more than rent charged . . . for comparable unassisted units in the premises." 24 C.F.R. § 982.507(d).

6.      From at least 2012 to present, Defendants falsely certified that they were not charging more in rent for assisted units than they were for comparable unassisted units in the same premises (the "rent comparability certification"). In this way, Defendants violated relevant

- 2 -

statutory, regulatory, and contractual requirements and defrauded HUD and the United States of America.

7.    By knowingly and expressly charging more for HCVP apartments than the law allows, Defendants are intentionally violating HUD regulatory and contractual requirements regarding apartment pricing, and are collecting tens of millions of dollars in rental payments to which they are not entitled.

8.    Until his forced resignation, relator Antoni Muhawi ("Mr. Muhawi") was an associate working for the Defendants. Mr. Muhawi discovered that they routinely defrauded HUD, and the United States Government. Based on what Mr. Muhawi has uncovered, the Defendants' conduct is at least reckless, but more likely deliberate and/or intentional.

9.    Defendants, who either themselves or through subsidiaries or sister entities, own thousands of HCVP units in Chicago (and other cities), accomplish this fraud in two primary ways.

10.    First, Defendants have an established internal policy that instructs their property managers and leasing agents to quote new HCVP tenants a monthly rental amount approximately *$150 above* the target rent for a particular unit, while a prospective tenant for a comparable unassisted apartment will not be quoted or charged that higher rental amount. Then, in documentation submitted to the Chicago Housing Authority ("CHA") as well as in the subsequent contract entered into with CHA, Defendants falsely certify that the rental amount for that assisted unit is no more than a comparable unassisted unit in the premises.

11.    Second, Defendants allow non-HCVP tenants (*i.e.*, unassisted tenants) to negotiate downward the monthly target rental amount during rental negotiations. HCVP tenants, on the

other hand, are not afforded such an opportunity, making their rents higher than non-subsidized tenants' rents for comparable unassisted units.

12.     Despite the disparities in rent created by Defendants' fraudulent practices, they regularly falsely certified compliance with the statutory, regulatory, and contractual requirements that mandate that they not charge more for HCVP units than they do for comparable unassisted units in the same premises.

13.     By so certifying, Defendants have knowingly violated a clear and material condition of receiving rental subsidy payments under the HCVP, and have knowingly submitted, or caused to be submitted, false or fraudulent claims, resulting in the receipt of tens of millions of dollars of rental payments that would not have been paid but for their misconduct.

14.     The FCA provides that any person who knowingly presents, causes to be presented, or conspires to present, a false or fraudulent claim to the United States of America for payment or approval is liable for a civil penalty of between $11,665 and $23,331[1] for each false or fraudulent claim submitted or paid, plus three times the amount of damages sustained by the United States of America from the payment of such fraudulent claims. The FCA's *Qui Tam* provisions further allow any person having information regarding a false or fraudulent claim against the United States of America to bring an action for himself or herself (as the "relator") and for the United States of America, and to share in any recovery.

---

[1]     This range of penalties was set by the Department of Justice and applies to penalties assessed after June 19, 2020 for violations that occurred after November 2, 2015. *See* 28 C.F.R. 85.5.

15.      Based on these provisions of the FCA, Mr. Muhawi, as relator and original source, seeks to recover damages, treble damages, and civil penalties arising from false claims made to the United States of America that were knowingly presented or caused to be presented to, and were paid by, the United States of America as a result of the acts of Defendants and their agents, subsidiaries, employees, and co-conspirators.

16.      Mr. Muhawi uncovered this fraud while conducting a rental pricing analysis after only a few months of employment. Mr. Muhawi presented these findings to Defendants' Financial Planning and Analysis team and informed Defendants' CFO of what he discovered. Defendants did nothing to change their practices.

## Parties

17.      Relator, Mr. Muhawi, is a resident of Illinois. From April 2017 until February 16, 2018 he was a management associate for Defendant Pangea Ventures, LLC, until he was abruptly forced to resign. Mr. Muhawi has personal knowledge of the facts alleged in this Third Amended Complaint and is acquainted with the Defendants and their business practices. He worked at Defendants' headquarters in Chicago, Illinois.

18.      Mr. Muhawi brings this action for violations of 31 U.S.C. Sections 3729, *et seq.,* on behalf of himself and the United States of America pursuant to 31 U.S.C. Section 3730(b)(1). The allegations of this action are based upon his personal knowledge, unless otherwise described as being made upon information and belief.

19.      Mr. Muhawi is the original source of the factual allegations of this Third Amended Complaint within the meaning of Section 3730(e)(4)(B) of the FCA. Mr. Muhawi is a highly educated financial professional with a Bachelor of Science degree in Industrial Engineering and

Operations Research from UC Berkeley as well as a Masters in Finance Degree from MIT Sloan School of Management.

20.     Upon information and belief, Defendant Pangea Equity Partners is an assumed name of Pangea Ventures, LLC with a principal office for the transaction of business located at 549 W. Randolph Street, 2nd Floor, Chicago, Illinois, 60661.

21.     Upon information and belief, Defendant Pangea Equity Partners, LP is a Delaware limited partnership with a principal office for the transaction of business located at 549 W. Randolph Street, 2nd Floor, Chicago, Illinois, 60661, and it is the parent company of Defendant Pangea Real Estate Holdings, LLC.

22.     Upon information and belief, Defendant Pangea Equity Partners II, LP is a Delaware limited partnership with a principal office for the transaction of business located at 549 W. Randolph Street, 2nd Floor, Chicago, Illinois, 60661. Upon information and belief, Defendant Pangea Equity Partners II, LP is wholly-owned by parent company Defendant Pangea Properties, and Defendant Pangea Equity Partners II, LP owns various property holding entities which own properties with apartment units leased to HCVP tenants.

23.     Upon information and belief, Defendant Pangea Properties is a Maryland corporation, taxed and treated as a private real estate investment trust, with a principal office for the transaction of business located at 549 W. Randolph Street, 2nd Floor, Chicago, Illinois, 60661.

24.     Upon information and belief, Defendant Pangea Ventures, LLC is a Delaware limited liability company with a principal office for the transaction of business located at 549 W. Randolph Street, 2nd Floor, Chicago, Illinois, 60661.

- 6 -

25.     Upon information and belief, Defendant Pangea Real Estate is an assumed name of Pangea Ventures, LLC with a principal office for the transaction of business located at 549 W. Randolph Street, 2nd Floor, Chicago, Illinois, 60661.

26.     Upon information and belief, Defendant Pangea Ventures, LLC, with the assumed name Pangea Real Estate, has operated at relevant times within the Pangea corporate framework as a management company for various entities. Upon information and belief, entities within the Pangea corporate framework that own buildings with units leased to HCVP tenants have granted to Defendant Pangea Ventures, LLC property management authorization through submission to CHA of HCVP affidavits of ownership. This property management authority includes (i) receiving housing assistance payments, (ii) executing HAP contracts, RFTAs, and all other required documentation requested by CHA, and (iii) acting as an owner representative to conduct business with CHA on matters including, but not limited to, submission of rent increase requests, being present for inspections, and attending meetings.

27.     Upon information and belief, Defendant Pangea Real Estate Holdings, LLC is a Delaware limited liability company with a principal office for the transaction of business located at 549 W. Randolph Street, 2nd Floor, Chicago, Illinois, 60661. Upon information and belief, Defendant Pangea Real Estate Holdings, LLC is wholly-owned by parent company Defendant Pangea Equity Partners, LP, and Defendant Pangea Real Estate Holdings, LLC owns various property holding entities that own properties with apartment units leased to HCVP tenants.

28.     Upon information and belief, Defendant Pangea Real Estate Holdings, LLC has operated at relevant times within the Pangea corporate framework as a management company for various entities. Upon information and belief, entities within the Pangea corporate framework that

own buildings with units leased to HCVP tenants have granted to Defendant Pangea Real Estate Holdings, LLC property management authorization through submission to CHA of HCVP affidavits of ownership. This property management authority includes (i) receiving housing assistance payments, (ii) executing HAP contracts, RFTAs, and all other required documentation requested by CHA, and (iii) acting as an owner representative to conduct business with CHA on matters including, but not limited to, submission of rent increase requests, being present for inspections, and attending meetings

29.     Upon information and belief, the entities referenced in paragraphs 20-28 are all related entities and a part of the same corporate family. Upon information and belief, all of these entities share common ownership and are under common control. They are collectively referred to herein as the "Defendants" and together they are the largest private HCVP landlord in Chicago.

30.     Non-party CHA is the most relevant local PHA. CHA is a municipal not-for-profit corporation in Chicago, Illinois through which HUD funds for the local HCVP are administered and with whom Defendants contract as a participating owner/landlord in that program.

## **Jurisdiction and Venue**

31.     Defendants are doing business and are authorized to do business in this district and are subject to this Court's jurisdiction.

32.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. Section 1331 and 31 U.S.C. Section 3732, both of which specifically confer jurisdiction on this Court for actions under the FCA (*i.e.*, under 31 U.S.C. Sections 3729 and 3730).

33.     Venue is proper under 31 U.S.C. Section 3732(a) because Defendants can be found and/or transact business within the Northern District of Illinois, and because violation of 31 U.S.C. Sections 3729 and 3730 alleged in this Third Amended Complaint occurred within this judicial district. Venue is also proper pursuant to 28 U.S.C. Sections 1391(b) and (c).

## I.     HUD's Housing Choice Voucher Program

34.     HUD distributes federal funds for the HCVP pursuant to Section 8 of the United States Housing Act of 1937, as amended. *See* 42 U.S.C. § 1437f(o) and 24 C.F.R. part 982. The HCVP provides rental subsidies for apartment units selected by tenants in the private market. In this way, the program assists eligible low income families in obtaining decent, safe, and sanitary housing. The HCVP is administered locally by PHAs, with funds allocated by HUD through contracts with PHAs. *See* 24 C.F.R. Part 982.

35.     Housing assistance, in the form of a voucher, is provided on behalf of the family or individual, and participants are able to find their own housing, including single-family homes, townhouses, and apartments.

36.     HCVP participants generally pay 30-40% of their monthly income toward rent. PHAs make monthly housing assistance payments to landlords on behalf of program participants for the remainder of the agreed-upon rent. HUD provides the PHAs with the funds to make the monthly housing assistance payments on behalf of program participants.

37.     Because HUD pays a portion of the monthly rent for program participants, the HCVP contains two types of limitations on the amount of rent that can be charged.

38.     First, the PHA must ensure that the rent being charged is reasonable, *i.e.*, that it is not more than the rent charged for comparable units in the private market and in the same premises. *See* 24 C.F.R. §§ 982.4 (definition of "reasonable rent"), 982.507(a)(1).

- 9 -

39.     Second, and separately, the landlord must certify that the rent charged to HCVP participants does not exceed the rent charged by that landlord to unassisted tenants in comparable units in the same premises. 24 C.F.R. § 982.507(d). In fact, "[b]y accepting each monthly housing assistance payment from the PHA, the owner certifies that the rent to owner is not more than rent charged by the owner for comparable units in the premises." *Id.*

40.     When an HCVP participant locates rental housing in the private market, the landlord fills out a Request for Tenancy Approval ("RFTA"), which is promulgated by HUD, specifying the proposed rent and lease term, and submits that form to the local PHA. In the RFTA, the landlord certifies, *inter alia*, "that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units." **Exhibit A**, ¶ 12. (sample RFTA).

41.     Where a landlord owns more than four units in a particular location, the landlord must provide rent information on the RFTA for the landlord's three "most recently leased comparable unassisted units within the premises." *Id.* This paragraph of the RFTA requesting the owner's certification and information on comparable unassisted units in the same premises (hereinafter referred to as the "RFTA Owner's Certification") says that "[t]he program regulation requires the PHA to certify that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units." *Id.*

42.     After the local PHA approves the RFTA, the landlord and tenant enter into a lease, and the landlord and PHA enter into a Housing Assistance Payments ("HAP") contract, again using a form promulgated by HUD. ***See* Exhibit B** (sample HAP contract).

43.     The HAP contract defines the legal relationship and the agreement between the owner/landlord and the PHA. The HAP contract sets forth, among other things, the amount of the

monthly assistance to be paid by the PHA to the owner on the tenant's behalf; the amount of the monthly rent to be paid by the tenant directly to the owner; and the amount of the monthly total rent that the owner is entitled to receive for lease of the dwelling unit.

44.     Federal regulations and the HAP contract mandate that an owner may not receive more money for an HCVP unit than it receives for a comparable unassisted unit.

45.     In particular, the relevant regulation provides that an owner, "[b]y accepting each monthly housing assistance payment from the PHA . . . certifies that the rent to owner is not more than the rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere." 24 C.F.R. § 982.507(d).

46.     The HAP contract contains similar language. Specifically, paragraph 6(d) of Part B of the HAP contract states that, "[d]uring the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere." Exhibit B, Part B, ¶ 6(d).

47.     Notably, the confirmation in paragraph 6(d) of the HAP contract quoted above—that the assisted rent charged by the owner is not higher than unassisted rents in the owner's comparable units—is distinct from the PHA's determination that the rent is reasonable. *Compare* Exhibit B, Part B, ¶ 6(a) with ¶ 6(d); *Compare also* 24 C.F.R. 982.507(a) with 24 C.F.R. 982.507(d); *see also United States v. Goodfish Enterprises, LLC et al.*, No. 20-CV-01722, Dkt. No. 22 (D. Del. 2020) (FCA complaint filed by United States against landlord charging more to assisted units than unassisted comparable units in same premises).

48.    Additionally, in paragraph 8(c) of Part B of the HAP contract, the owner certifies that "[t]he rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises." Exhibit B, Part B, ¶ 8(c).

49.    Similarly, in Part C of the HAP contract (Tenancy Addendum), paragraph 4(c)(2) states that, "[d]uring the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed . . . [r]ent charged by the owner for comparable unassisted units in the premises." Exhibit B, Part C, ¶ 4(c)(2).

50.    The HAP contract expressly conditions the landlord's right to receive housing assistance payments from the PHA on compliance with all terms of the HAP contract, including without limitation, the rent comparability certification. *See* Exhibit B, Part B, ¶ 7(b) ("Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.").

51.    By operation of 24 C.F.R. § 982.507(d), each time a landlord accepts a monthly housing assistance payment from the PHA, the landlord again certifies "that the rent to owner is not more than rent charged by the owner for comparable unassisted units in the premises."

52.    Thus, as a condition of participation in the HCVP, the landlord is required to certify that the rent charged to the HCVP participant does not exceed that charged to unassisted tenants in comparable units: (a) when the RFTA is filed; (b) when the HAP contract is executed; and (c) each time a housing assistance payment is received.

## II.    **Defendants' Fraud**

53.    At all times relevant, CHA, through the receipt of federal funds from HUD, administered the Section 8 HCVP in Chicago, Illinois.

54.    At all times relevant, the Defendants, either themselves or through their subsidiaries or sister entities, were owners of numerous multifamily apartment complexes with thousands of HCVP units within the city of Chicago, and they contracted directly with CHA under the HCVP by, among other things, executing and entering into HAP contracts and receiving housing assistance payments from HUD, through CHA.

55.    As stated above, Defendants engaged in their fraud in two primary ways:  first, they intentionally charged rents to HCVP tenants above the rents they charged non-HCVP tenants in comparable units; and second, they allowed non-HCVP tenants to negotiate downward the rental amount but did not allow for similar negotiated reductions in rent for HCVP tenants. In both instances, the result is that HUD, and the United States Government, pays more for HCVP tenants than non-HCVP tenants pay.

56.    Despite these deliberate rent differentials, Defendants falsely certify in RFTAs, in HAP contracts, and through their receipt of monthly subsidy payments, that the rent they charge to a particular HCVP tenant *does not exceed* rent charged for a comparable unassisted unit in the premises. The opposite is true. In this way, Defendants are defrauding the Government.

57.    Beginning no later than 2012, Defendants began committing their HCVP fraud on HUD and the United States Government. Their first method — intentionally quoting (and ultimately charging) rental amounts for HCVP tenants above target rent and falsely certifying that the proposed rent was no more than the comparable unassisted units in the premises — was the Defendants' own stated internal policy.

- 13 -

58.     In particular, Defendants' internal memorandum, titled "CHA Rules to Live By," instructed employees working with HCVP tenants to list the proposed rent fraudulently on the RFTA at "$100-150 above the target rent – NEVER TBD." This internal memorandum was kept on Defendants' internal shared drive and widely available to Defendants' employees. In addition, on Defendants' internal enterprise knowledge management system, also known as Pangea Knowledge Base, there was an instruction to property managers to submit rent requests to CHA at "$150 over target." The Pangea Knowledge Base was widely available to Defendants' employees.

59.     As well, Defendants created an internal guide that instructed their employees to lie on the RFTA forms. This internal guide was also kept on Defendants' internal shared drive and widely available to Defendants' employees. In particular, for the RFTA Owner's Certification, the instruction was to "[e]nter [the] address, last rented & amount of comparable unit in building that is occupied and paying the same rent. If there aren't any put unit the voucher holder wants, desired rent amount." In sum, this instruction means that, if there are no unassisted comparable units paying the same rent listed in the proposed rent section of the RFTA, the employee is then to list the unit to be leased by this HCVP tenant and the rent that has been proposed, and ignore any other unassisted comparable units that are paying less. This is exactly what took place.

60.     For example, HCVP Tenant A rented Defendants' Chicago apartment 4714 S. Michigan Avenue, Unit 2E in or about December 2016. This unit is in an apartment building complex with approximately twenty-four units (some HCVP and some unassisted) located at 4714 – 4720 S. Michigan Avenue. The RFTA, signed by Defendant Pangea Real Estate, which upon information and belief is an assumed name for Pangea Ventures, LLC, listed a proposed monthly rent for Tenant A of $1,205. In the RFTA Owner's Certification, that same unit and the

same proposed rent were listed even though there was a comparable unassisted unit within the premises that had been recently leased at a lower amount. Had the RFTA been properly and truthfully prepared for Tenant A and Unit 2E, Unit 3E of 4714 S. Michigan Avenue, which had been leased in or about November 2016 by a non-HCVP tenant for $975 per month, would have been listed. Yet Tenant A's rent was the full $1,205.

61.     Another example is HCVP Tenant B, who rented Defendants' Chicago apartment 1105 N. Lawler Avenue, Unit 1 in or about November 2016. The RFTA, signed by Defendant Pangea Real Estate, which upon information and belief is an assumed name for Pangea Ventures, LLC, listed a proposed monthly rent for Tenant B of $895. In the RFTA Owner's Certification, the same unit and the same proposed rental amount were listed. Had the RFTA been properly and truthfully prepared for Tenant B and Unit 1, Unit 2 of 1105 N. Lawler Avenue, which had the same lease start date as Unit 1 and was leased to a non-HCVP tenant with a lower monthly rent of $829, would have been listed.

62.     A slight variation to this first method of listing the same unit in the RFTA Owner's Certification occurred where the Defendants would list a comparable unassisted unit in the building but still list the proposed rent instead of the true rent that the unassisted unit was being charged.

63.     For example, in or about August 2015, HCVP Tenant C rented Defendants' Chicago apartment 8308 S. Ingleside Avenue, Unit 1C, and the proposed rent listed in the RFTA was $710 per month. The RFTA was signed by Pangea Real Estate, LLC. Upon information and belief, Pangea Real Estate, LLC is not an entity. Upon information and belief, Defendants' reference to Pangea Real Estate, LLC is likely a reference to Pangea Real Estate, an assumed name for Pangea Ventures, LLC, or a reference to Pangea Real Estate Holdings, LLC. In the

RFTA Owner's Certification, Unit 2C was listed as the comparable unassisted unit in the premises with a lease start date of July 1, 2014. But, in order to deceive HUD and CHA, the rental amount listed for that comparable unit was $710 when, in fact, Unit 2C's rent was only $660 per month.

64. Another example of this is HCVP Tenant D, who rented Defendants' Chicago apartment 10912 S. Vernon Avenue, Unit 1S, in or about January 2016. In Tenant D's RFTA, signed by Defendant Pangea Real Estate, which is an assumed name for Pangea Ventures, LLC, the proposed rent for Unit 1S was $1,135. The RFTA Owner's Certification listed Unit 2S in that building as the comparable unassisted unit and listed the rental amount for Unit 2S as $1,135. But the rental amount for Unit 2S was materially false because Unit 2S was actually renting for $815 per month. Yet the Defendants charged Tenant D the full $1,135 monthly rent.

65. The second way the Defendants commit their HCVP fraud is by negotiating the target rent downward for non-HCVP tenants, while not doing the same for HCVP tenants.

66. Over the years, and regardless of the fraudulent method used by the Defendants, the reality is that both methods have resulted in thousands of false certifications of compliance by the Defendants with their regulatory and HAP contract requirements where they falsely certified that they were not charging more to HCVP tenants than to a non-HCVP tenant renting a comparable unit.

67. For instance, HCVP Tenant E rented Defendants' Chicago apartment 7622 S. Coles Avenue, Unit 1 in or about November 2013. The HAP contract, which was signed by Defendant Pangea Real Estate Holdings, LLC, contains the relevant certifications regarding rent to owner not exceeding the amount charged for a comparable unassisted unit and indicates an

initial rent of $960 per month for this unit. Despite that certification in the HAP contract, Unit 2 in that building was a comparable unit rented by a non-HCVP tenant for $810 per month.

68.      Another example of a clear violation of the terms of the HAP contract are seen in HCVP Tenant F's rental of Defendants' Chicago apartment 5316 W. Washington Boulevard, Unit 2 in or about October 2013. The monthly rent being charged to Tenant F was $1,080 and the HAP contract, which was signed by Defendant Pangea Real Estate Holdings, LLC, contained the requisite certifications that this assisted unit was not being charged more in rent than a comparable unassisted unit. These certifications, however, were false. In the month prior to Tenant F's lease, Defendants leased Units 1 and 3—comparable unassisted units in that building—for $930 per month.

69.      At bottom, whether Defendants purposefully quote and charge approximately $150 more to HCVP tenants, negotiate downward with non-HCVP tenants without doing the same for HCVP tenants, or otherwise find a way to deliberately charge more to their HCVP tenants than to their non-HCVP tenants renting comparable units, the result is the same. That is, Defendants routinely charge higher rents to HCVP tenants than to non-HCVP tenants renting comparable unassisted units, and the Defendants falsely certify to CHA and HUD, and ultimately to the United States of America, that they are in compliance with the regulatory and contractual requirements that HCVP tenants' rent not exceed rent for comparable unassisted units.

70.      Each time that Defendants falsely certified that an HCVP participant was not being charged a rent higher than that charged to unassisted tenants in comparable units, the Defendants were either actually aware that their certifications were false or acted in reckless disregard or deliberate indifference of the truth or falsity of their certifications.

- 17 -

71.     The Defendants were fully aware of the rent being charged on each of their properties in each month. As a result, any failure of the Defendants to verify the truth of their required certifications of rent comparability was the result of actual, reckless, or deliberate indifference to this mandatory program requirement.

72.     Each time that the Defendants submitted false information on an RFTA and/or received each monthly housing assistance payment for an HCVP unit with a higher rent than a comparable non-HCVP unit in the same premises, they were either actually aware that the information they provided was false or acted in reckless disregard or deliberate indifference of the truth or falsity of that information.

73.     The Defendants were fully aware of the dates on which comparable properties had most recently leased and of the current rent being charged for each of their properties. As a result, the false information they provided and false certifications they made were either provided with knowledge of the falsity or was the result of reckless disregard or deliberate indifference.

74.     CHA administers the HCVP in Chicago, Illinois, and it contracts with HUD and receives federal funds from HUD to administer the HCVP and disburses housing assistance payments to landlords consistent with statutory, regulatory, and contractual requirements.

75.     On September 10, 2021, CHA signed a declaration regarding its administration of the HCVP. The declaration is signed by Cheryl Burns, CHA's Chief Housing Choice Voucher Officer. A copy of the declaration is attached as **Exhibit C**.

76.     In the declaration, CHA confirms that "[a]s a condition to receiving monthly housing assistance payments under the HCVP, participating landlords must certify that they are not charging more in rent for HCVP assisted units than for comparable unassisted units in the same premises." Exhibit C, ¶ 3. CHA confirms that the rent comparability certification is

contained in RFTAs, HAP contracts, federal regulations (24 C.F.R. § 982.507(d)), and in CHA's administrative plans. Like the federal regulations and HAP contracts, CHA's administrative plans, which are found on its website, instruct the participating landlords that they cannot charge more for assisted units than they do for unassisted units in the same premises. For example, CHA's administrative plan adopted by its Board of Commissioners and made effective as of December 1, 2012 includes a section titled "Rents Charged for Other Units on the Premises." This section informs landlords that they are required to list on the RFTA "the rent charged for other unassisted comparable units on the premises if the premises include more than four (4) units." This same section of the administrative plan includes the regulatory language from 24 C.F.R. § 982.507(d) and states that "[b]y accepting the PHA payment each month the owner certifies that the rent is not more than the rent charged for comparable unassisted units on the premises."

77.    In the declaration, CHA further confirms that it "relies on the truth and accuracy" of the rent comparability certification in its administration of the HCVP and that the certification "is separate and distinct from a rent reasonableness determination made by or on behalf of the CHA." Exhibit C, ¶¶ 4-5. Indeed, the rent comparability certification is material to CHA's administration of the HCVP, and a determination by or on behalf of CHA that a rent is "reasonable" does not absolve a landlord who falsely certifies that the rent they are charging to an HCVP tenant is not more than the landlord is charging to a non-HCVP tenant renting a comparable unit in the same premises.

78.    HUD and CHA rely on Defendants' compliance with their contractual and regulatory certifications in the administration of the HCVP, including but not limited to the truth and accuracy of the rent comparability certification. HUD conditions the subsidy payments that

Defendants receive based on the certifications that they are not charging more to HCVP tenants than to non-HCVP tenants in comparable units.

79.     As a result of their materially false statements and false certifications, Defendants entered into numerous HAP contracts and leases that illegally charged HCVP tenants higher rents than those being paid by unassisted tenants in comparable properties.

80.     As a further result of Defendants' materially false statements and false certifications, HUD, through CHA and other local PHA's, made monthly housing assistance payments to Defendants that were higher than permitted under the terms of the HCVP.

81.     Upon information and belief, at least Defendant Pangea Real Estate Holdings, LLC and Defendant Pangea Ventures, LLC received monthly housing assistance payments as a result of the fraudulent conduct described herein. Defendant Pangea Real Estate Holdings, LLC submitted W-9 Request for Taxpayer Information Forms to CHA and received direct deposits of monthly housing assistance payments, knowing that such payments were obtained as a result of the fraudulent conduct alleged herein. Upon information and belief, Defendant Pangea Ventures, LLC submitted void checks to CHA and received direct deposits of monthly housing assistance payments, knowing that such payments were obtained as a result of the fraudulent conducted alleged herein.

82.     In the absence of Defendants' materially false statements and false certifications, the rents for numerous HCVP participants would have been set at lower monthly amounts, resulting in lower housing assistance payments from HUD, through CHA and other local PHA's, to Defendants.

83.     Had HUD been aware of Defendants' material false statements, false certifications, and illegal actions, HUD would have taken action to either reduce the housing assistance payments made to Defendants or suspended their participation in the HCVP.

84.     Defendants accepted the monthly housing assistance payments and kept the money without notifying HUD or the federal government that they were not in compliance with their contractual and regulatory certifications, nor did Defendants return any money to which they were not entitled due to their misconduct and materially false certifications.

85.     Defendants have had, and have, the requisite knowledge of these practices under the FCA and upon information and belief the fraud is ongoing.

**<u>Count One</u>**

**<u>Substantive Violations of the False Claims Act</u>**
**[31 U.S.C. §§ 3729(a)(1)(A)]**

86.     Mr. Muhawi repeats and realleges each allegation of numbered paragraphs 1 through 85 of this Third Amended Complaint as part of this First Cause of Action.

87.     The Defendants, together with their agents, subsidiaries, employees, and co-conspirators, knowingly presented and caused to be presented materially false or fraudulent claims to the United States of America for housing assistance payments under the HCVP in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A).

88.     The false or fraudulent statements were contained in RFTAs, HAP contracts, and certifications made pursuant to 24 C.F.R. § 982.507(d).

89.     As a result of the knowingly false and fraudulent claims submitted or caused to be submitted by Defendants, together with their agents, subsidiaries, employees, and co-conspirators, the United States of America, through HUD, paid rental subsidies to which the Defendants were otherwise not entitled.

90.     Because of the Defendants' false claims, the United States of America suffered substantial damages. Total damages are unknown at this time, but they are expected to exceed tens of millions of dollars.

91.     As a result of the knowingly fraudulent conduct of the Defendants, together with that of their respective agents, subsidiaries, employees, and co-conspirators, Defendants are jointly and severally liable to the United States of America for the amount of the payments made to them, trebled, plus penalties, interest, and attorneys' fees and expenses under the FCA.

### Count Two

### Substantive Violations of the False Claims Act
### [31 U.S.C. §§ 3729(a)(1)(B)]

92.     Mr. Muhawi repeats and realleges each allegation of numbered paragraphs 1 through 91 of this Third Amended Complaint as part of this Second Cause of Action.

93.     The Defendants, together with their agents, subsidiaries, employees, and co-conspirators knowingly made, used, or caused to be made or used, false records or statements that were material to claims to the United States for housing assistance payments under the HCVP in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).

94.     The false or fraudulent records and/or statements were contained in RFTAs, HAP contracts, and certifications made pursuant to 24 C.F.R. 982.507(d).

95.     The false or fraudulent records and/or statements were material to the Defendants' claims for housing assistance payments under the HCVP in that HUD would not have made or reimbursed the housing assistance payments absent the false or fraudulent records and/or statements.

96. Because of Defendants' false or fraudulent records or statements, the United States of America suffered damages, which total, at this time, is unknown but which can be expected to equal or exceed tens of millions of dollars.

97. As a result of the knowingly fraudulent conduct of the Defendants, together with that of their respective agents, subsidiaries, employees, and co-conspirators, Defendants are jointly and severally liable to the United States of America for the amount of the payments made, trebled, plus penalties, interest, and attorneys' fees and expenses under the FCA.

### Jury Demand

Mr. Muhawi demands a jury on all issues and matters triable by a jury.

### Relief Requested

WHEREFORE, the United States of America *ex rel.* Antoni Muhawi demands judgment against Defendants as follows:

a) On the First Cause of Action, for treble damages under 31 U.S.C. §§ 3729(a)(1)(A) in an amount to be determined at trial, plus statutory penalties per claim, costs, interest, expenses, and attorneys' fees;

b) On the Second Cause of Action, for treble damages under 31 U.S.C. §§ 3729(a)(1)(B) in an amount to be determined at trial, plus statutory penalties per claim, costs, interest, expenses, and attorneys' fees;

c) On all Causes of Action, for the damages sustained by the United States of America; and

d) For award of such other and further relief as this Court deems proper as a matter of law or under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, including fees, costs, and expenses pursuant to Section 3730(d).

- 23 -

Dated:     December 17, 2021

**HODGSON RUSS** LLP
*Attorneys for Plaintiff-Relator Antoni Muhawi*

By: _____
     Daniel C. Oliverio (*pro hac vice*)
     Robert J. Fluskey, Jr.
     Patrick E. Fitzsimmons (*pro hac vice*)
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
716.856.4000
*doliverio@hodgsonruss.com*
*rfluskey@hodgsonruss.com*
*pfitzsimmons@hodgsonruss.com*

Motion for admission *pro hac vice* to this
Court to be filed by Robert J. Fluskey, Jr.

**SCHIFF HARDIN** LLP
*Attorneys for Plaintiff-Relator Antoni Muhawi*
     William P. Ziegelmueller
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
312.258.5500
*bziegel@schiffhardin.com*

# EXHIBIT A

# Request for Tenancy Approval
## Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 09/30/2017)

Public reporting burden for this collection of information is estimated to average .08 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number. The Department of Housing and Urban Development (HUD) is authorized to collect information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of the data on the family's selected unit is mandatory. The information is used to determine if the unit is eligible for rental assistance. HUD may disclose this information to Federal, State, and local agencies when relevant civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released ourside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family voucher assistance.

1. Name of Public Housing Agency (PHA)

2. Address of Unit (street address, apartment number, city, State & zip code)

| 3. Requested Beginning Date of Lease | 4. Number of Bedrooms | 5. Year Constructed | 6. Proposed Rent | 7. Security Deposit Amt. | 8. Date Unit Available for Inspection |
|---|---|---|---|---|---|
| | | | | | |

9. Type of House/Apartment

☐ Single Family Detached  ☐ Semi-Detached / Row House  ☐ Manufactured Home  ☐ Garden / Walkup  ☐ Elevator / High-Rise

10. If this unit is subsidized, indicate type of subsidy:

☐ Section 202  ☐ Section 221(d)(3)(BMIR)  ☐ Section 236 (Insured or noninsured)  ☐ Section 515 Rural Development

☐ Home  ☐ Tax Credit

☐ Other  (Describe Other Subsidy, Including Any State or Local Subsidy) _____

11. Utilities and Appliances
The owner shall provide or pay for the utilities and appliances indicated below by an "**O**". The tenant shall provide or pay for the utilities and appliances indicated below by a "**T**". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | | Provided by | Paid by |
|---|---|---|---|---|---|---|---|
| Heating | ☐ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | | |
| Cooking | ☐ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | | |
| Water Heating | ☐ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | | |
| Other Electric | | | | | | | |
| Water | | | | | | | |
| Sewer | | | | | | | |
| Trash Collection | | | | | | | |
| Air Conditioning | | | | | | | |
| Refrigerator | | | | | | | |
| Range/Microwave | | | | | | | |
| Other (specify) | | | | | | | |

Previous editions are obsolete

Page 1 of 2

form **HUD-52517**  (09/2014)
ref. Handbook 7420.8

12.    Owner's Certifications.

a.    The program regulation requires the PHA to certify that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units. **Owners of projects with more than 4 units must complete the following section for most recently leased comparable unassisted units within the premises.**

| Address and unit number | Date Rented | Rental Amount |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

b.    The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving leasing of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

c.    Check one of the following:

_____    Lead-based paint disclosure requirements do not apply because this property was built on or after January 1, 1978.

_____    The unit, common areas servicing the unit, and exterior painted surfaces associated with such unit or common areas have been found to be lead-based paint free by a lead-based paint inspector certified under the Federal certification program or under a federally accredited State certification program.

_____    A completed statement is attached containing disclosure of known information on lead-based paint and/or lead-based paint hazards in the unit, common areas or exterior painted surfaces, including a statement that the owner has provided the lead hazard information pamphlet to the family.

13.    **The PHA has not screened the family's behavior or suitability for tenancy. Such screening is the owner's own responsibility.**

14.    The owner's lease must include word-for-word all provisions of the HUD tenancy addendum.

15.    The PHA will arrange for inspection of the unit and will notify the owner and family as to whether or not the unit will be approved.

| Print or Type Name of Owner/Owner Representative | Print or Type Name of Household Head |
|---|---|
| Signature | Signature (Household Head) |
| Business Address | Present Address of Family (street address, apartment no., city, State, & zip code) |

| Telephone Number | Date (mm/dd/yyyy) | Telephone Number | Date (mm/dd/yyyy) |
|---|---|---|---|
| | | | |

# EXHIBIT B

# Housing Assistance Payments Contract

## (HAP Contract)

### Section 8 Tenant-Based Assistance
### Housing Choice Voucher Program

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577- 0169
(Exp. 1031/2010)

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

---

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA) . The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins). See

section by section instructions. Part B
Body of contract
Part C Tenancy addendum

**Use of this form**

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

> Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

> Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**
Section by Section Instructions

Section 2: **Tenant**
Enter full name of tenant.

Section 3. **Contract Unit**
Enter address of unit, including apartment number, if any.

Section 4. **Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

Section 5. **Initial Lease Term**
Enter first date and last date of initial lease term.

The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

> ■ Such shorter term would improve housing opportunities for the tenant, **and**

> ■ Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**
Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**
Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances**.
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

form **HUD-52641** (8/2009)
ref Handbook 7420.8

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

---

Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1.  **Contents of Contract**
    This HAP contract has three parts:

    Part A: Contract Information

    Part B: Body of Contract Part

    C: Tenancy Addendum

2.  **Tenant**

3.  **Contract Unit**

4.  **Household**

    The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

5.  **Initial Lease Term**

    The initial lease term begins on (mm/dd/yyyy): _____

    The initial lease term ends on (mm/dd/yyyy): _____

6.  **Initial Rent to Owner**
    The initial rent to owner is: $ _____
    During the initial lease term, the owner may not raise the rent to owner.

7.  **Initial Housing Assistance Payment**

    The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ _____ per month.
    The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

---

8.  **Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an " **O**". The tenant shall provide or pay for the utilities and appliances indicated below by a "**T**". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | Provided by | Paid by |
|------|------|------|------|------|------|------|
| Heating | ☐ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | | |
| Cooking | ☐ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | | |
| Water Heating | ☐ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | | |
| Other Electric | | | | | | |
| Water | | | | | | |
| Sewer | | | | | | |
| Trash Collection | | | | | | |
| Air Conditioning | | | | | | |
| Refrigerator | | | | | | |
| Range/Microwave | | | | | | |
| Other (specify) | | | | | | |

**Signatures:**

**Public Housing Agency**                                    **Owner**

_____          _____
Print or Type Name of PHA                          Print or Type Name of Owner

_____          _____
Signature                                                       Signature

_____          _____
Print or Type Name and Title of Signatory       Print or Type Name and Title of Signatory

_____          _____
Date (mm/dd/yyyy)                                        Date (mm/dd/yyyy)

**Mail Payments to:**

_____
Name

_____
Address (street, city, State, Zip)

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

---

## Part B of HAP Contract: Body of Contract

1. **Purpose**
   a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).
   b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.
   c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.
   d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**
   a. The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.
   b. The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.
   c. The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).
   d. The owner certifies that:
      (1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.
      (2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.
      (3) The lease is consistent with State and local law.
   e. The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**
   a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).
   b. The owner must provide all utilities needed to comply with the HQS.
   c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies

for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.
   d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.
   e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.
   f. The PHA must notify the owner of any HQS defects shown by the inspection.
   g. The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**
   a. **Relation to lease term**. The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).
   b. When HAP contract terminates.
      (1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.
      (2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.
      (3) If the family moves from the contract unit, the HAP contract terminates automatically.
      (4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.
      (5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.
      (6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in aide.

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

5. **Provision and Payment for Utilities and Appliances**

   a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

   b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

   c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

6. **Rent to Owner: Reasonable Rent**

   a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

   b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

      (1) The location, quality, size, unit type, and age of the contract unit; and

      (2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

   c. The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

   d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

7. **PHA Payment to Owner**

   a. When paid

      (1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

      (2) The PHA must pay housing assistance payments promptly when due to the owner.

      (3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

      (4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

   b. **Owner compliance with HAP contract**. Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

   c. **Amount of PHA payment to owner**

      (1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

      (2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

      (3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

   d. **Application of payment**. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   e. **Limit of PHA responsibility**

      (1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

      (2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

   f. **Overpayment to owner**. If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

8. **Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

9.  **Prohibition of Discrimination**. In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

10.  **Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

11.  **PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

12.  **Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of

the contract unit or the premises or with implementation of the HAP contract.

13. **Conflict of Interest**
   a. "Covered individual" means a person or entity who is a member of any of the following classes:
      (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);
      (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;
      (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or
      (4) Any member of the Congress of the United States.
   b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.
   c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.
   d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.
   e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.
   f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.
   g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

14. **Assignment of the HAP Contract**
   a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.
   b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.
   c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).
   d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:
      (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or
      (2) A court or administrative agency has determined that the owner or proposed new owner violated

the Fair Housing Act or other Federal equal opportunity requirements.
   e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.
   f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):
      (1) Has violated obligations under a housing assistance payments contract under Section 8;
      (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;
      (3) Has engaged in any drug-related criminal activity or any violent criminal activity;
      (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;
      (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:
         (a) Threatens the right to peaceful enjoyment of the premises by other residents;
         (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;
         (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or
         (d) Is drug-related criminal activity or violent criminal activity;
      (6) Has a history or practice of renting units that fail to meet State or local housing codes; or
      (7) Has not paid State or local real estate taxes, fines or assessments.
   g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

15. **Foreclosure.** In the case of any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does not affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

form HUD-52641 (8/2009)
ref Handbook 7420.8

16. **Written Notices**. Any notice by the PHA or the owner in connection with this contract must be in writing.


17. **Entire Agreement: Interpretation**
   a. The HAP contract contains the entire agreement between the owner and the PHA.
   b     The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

---

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**

   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**

   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**

   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

   d. The tenant may not sublease or let the unit.

   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**

   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

   c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

   (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**

   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**

   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**

   a. **Maintenance**

---

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b.  **Utilities and appliances**

(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

(a) Pay for any utilities that are to be paid by the tenant.

(b) Provide and maintain any appliances that are to be provided by the tenant.

c.  **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d.  **Housing services.** The owner must provide all housing services as agreed to in the lease.

8.  **Termination of Tenancy by Owner**

a.  **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b.  **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;

(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3) Criminal activity or alcohol abuse (as provided in paragraph c); or

(4) Other good cause (as provided in paragraph d).

c.  **Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

(a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

(b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

(c) Any violent criminal activity on or near the premises; or

(d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

(a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d.  **Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause may include:

(a) Disturbance of neighbors,

(b) Destruction of property, or

(c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause may include:

(a) The tenant's failure to accept the owner's offer of a new lease or revision;

(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

(5) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

(6) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This

provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

**e. Protections for Victims of Abuse.**

(1)  An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2)  Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3)  Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4)  Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5)  Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a

more demanding standard than other tenants in determining whether to evict or terminate.

(6)  Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7)  Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

**f.  Eviction by court action.** The owner may only evict the tenant by a court action.

**g.  Owner notice of grounds**

(1)  At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2)  The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3)  Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

**9.  Lease: Relation to HAP Contract**

If the HAP contract terminates for any reason, the lease terminates automatically.

**10.  PHA Termination of Assistance**

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

**11.  Family Move Out**

The tenant must notify the PHA and the owner before the family moves out of the unit.

**12.  Security Deposit**

a.  The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b.  When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

### 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

### 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

### 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

### 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

### 17. Definitions

**Contract unit**. The housing unit rented by the tenant with assistance under the program.

**Family**. The persons who may reside in the unit with assistance under the program.

**HAP contract**. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household**. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS)**. The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD**. The U.S. Department of Housing and Urban Development.

**HUD requirements**. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease**. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA**. Public Housing Agency.

**Premises**. The building or complex in which the contract unit is located, including common areas and grounds.

**Program**. The Section 8 housing choice voucher program.

**Rent to owner**. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8**. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant**. The family member (or members) who leases the unit from the owner.

**Voucher program**. The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

---

UNITED STATES OF AMERICA, *ex rel.*

ANTONI MUHAWI,

                             Plaintiff,

       v.

PANGEA EQUITY PARTNERS,
PANGEA EQUITY PARTNERS, LP,
PANGEA EQUITY PARTNERS II, LP,
PANGEA PROPERTIES,
PANGEA VENTURES, LLC,
PANGEA REAL ESTATE,
PANGEA REAL ESTATE HOLDINGS, LLC, and
CHICAGO HOUSING AUTHORITY,

                             Defendants.

Case No.: 18-CV-02022
Hon. Manish S. Shah
Magistrate Judge Mary M. Rowland

---

## DECLARATION OF CHERYL BURNS

      CHERYL BURNS, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares the following to be true and correct:

      1.      I am the Chief Housing Choice Voucher Officer for the Chicago Housing Authority ("CHA"). I provide this declaration to clarify certain aspects of the United States Housing and Urban Development's ("HUD") Section 8 Housing Choice Voucher Program (the "HCVP") and CHA's administration of the HCVP.

2. The United States Government, through HUD, provides financial assistance under the HCVP to low-income families, the elderly, and the disabled so they are able to afford decent, safe, and sanitary housing in the private rental market. To accomplish this, HUD provides federal funds to local public housing authorities, such as CHA, who make monthly housing assistance payments to landlords on behalf of eligible HCVP participants.

3. As a condition to receiving monthly housing assistance payments under the HCVP, participating landlords must certify that they are not charging more in rent for HCVP assisted units than for comparable unassisted units in the same premises (the "Owner's Certification"). The Owner's Certification is contained in: (1) the Requests for Tenancy Approval ("RFTA") that landlords complete and submit to CHA; (2) the Housing Assistance Payments ("HAP") contracts that landlords enter into with CHA; and (3) federal regulations (24 C.F.R. § 982.507(d)). The requirement of an Owner's Certification is also contained in CHA's HCVP Administrative Plan.

4. The Owner's Certification is required by federal law and necessary to the administration of the HCVP. In administering the HCVP, CHA relies on the truth and accuracy of the Owner's Certification, among other program requirements.

5. The Owner's Certification is separate and distinct from a rent reasonableness determination made by or on behalf of the CHA.

DATED:     September 10, 2021

**CHICAGO HOUSING AUTHORITY**

By: _____

CHERYL BURNS

- 2 -