UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ANTONI MUHAWI, <br><br> Plaintiff, <br><br> v. <br><br> PANGEA EQUITY PARTNERS, *et al.*, <br><br> Defendants. | Case No. 18-cv-02022 <br><br> Hon. Manish S. Shah <br> Magistrate Judge Mary M. Rowland |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Defendants Pangea Equity Partners, Pangea Equity Partners, LP, Pangea Equity Partners II, LP, Pangea Properties, Pangea Ventures, LLC, Pangea Real Estate, and Pangea Real Estate Holdings, LLC (collectively, "the Pangea Defendants") respectfully move for summary judgment. As set forth below, there is no genuine dispute as to any material fact and the Pangea Defendants are entitled to judgment as a matter of law.

**INTRODUCTION**

The plaintiff-relator, Antoni Muhawi, asserts two claims under the False Claims Act ("FCA"). He alleges that the Pangea Defendants defrauded the U.S. Department of Housing and Urban Development ("HUD") with respect to the Housing Choice Voucher Program ("HCVP") by making false certifications to the Chicago Housing Authority ("CHA"), which administers the voucher program in Chicago. But the alleged false certifications were not material to the payment decision, as required by *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 181 (2016) ("*Escobar*"), because the undisputed evidence establishes that CHA knew full well about

their alleged falsity and continued to make housing assistance payments to the Pangea Defendants anyway. Therefore, the FCA claims must be dismissed.

## PROCEDURAL BACKGROUND

Mr. Muhawi filed his original complaint and first amended complaint against the Pangea Defendants only. (Docs. 1, 5.) In February 2021, Mr. Muhawi filed a Second Amended Complaint ("SAC") that added CHA as an alleged codefendant of the Pangea Defendants. (Doc. 23.) It alleged that CHA conspired with the Pangea Defendants in their fraud and that CHA made housing assistance payments to the Pangea Defendants despite knowing "full well" that they were charging more for assisted units than comparable unassisted units in the same premises, and were falsely certifying to the contrary. (*Id. ¶* 19).

In August 2021, after this case was unsealed, the Pangea Defendants moved to dismiss on the ground that the FCA claims were undermined by relator's allegations that CHA chose to keep making payments despite knowing that the certifications were not correct. In response to this motion, relator dismissed his claims against CHA on September 10, 2021. (Doc. 51.) He then sought to file a Third Amended Complaint ("TAC") which eliminated the allegations that CHA knew about the false certifications and had made payments to the Pangea Defendants anyway.

The Pangea Defendants opposed this maneuver on the ground that relator was seeking to scrub relevant facts (CHA's knowledge) from the record in order to save his case from dismissal. On December 16, 2021, the Court granted relator leave to file the TAC and terminated the Pangea Defendants' motion to dismiss as moot. The Court's order noted that "[t]he truth will out soon enough, and the court will entertain requests to efficiently brief (or if necessary conduct discovery on) the materiality of the allegedly false claims or the CHA's knowledge of the representations without incurring disproportionate expense." (Doc. 63.)

#154430272_v2

Accordingly, the Pangea Defendants now move for summary judgment because the undisputed evidence shows that the alleged false certifications were not material to the payment decision. *See West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 173 (3d Cir. 2013) (summary judgment is the appropriate procedure where a plaintiff retracts admissions made in its complaint in response to a motion to dismiss). As shown below, relator's admissions that CHA knew all about the alleged false certifications are corroborated by documentary evidence demonstrating that the Pangea Defendants disclosed the relevant information to CHA in 2015. The material facts are undisputed and summary judgment is warranted.

## THE UNDISPUTED FACTS

The HUD Section 8 HCVP is administered by CHA in Chicago, Illinois. (Pangea Defendants' Statement of Material Facts "SOF" ¶ 1.) At all times relevant, the Pangea Defendants or affiliated entities owned numerous multifamily apartment complexes with thousands of HCVP units within the city of Chicago, and they contracted directly with CHA under the HCVP. (*Id.* ¶ 2.)

### I. The Documentary Evidence

On April 10, 2015, a CHA employee sent an email to a Pangea employee advising her that "[t]he Housing Specialists in [CHA's] Leasing Department were informed today that going forward, all Pangea RTAs [Requests for Tenancy Approval] must be submitted together with a rent roll." (*Id.* ¶ 3.) That same day, Cheryl Burns at CHA sent an email to the Pangea employee stating that, "[a]fter our meeting Katie [Ludwig, a CHA staffer] and I discussed the complaints of the participants as it relates to the changing rents. We would like copies of the rent rolls for the buildings that you have HCV residents in. Please know that we have gotten rent rolls from other

3

owners and believe that as stewards of the HCV program we should do some due diligence in response to the complaints." (*Id.* ¶ 5.)

Pangea was reluctant to provide the requested information. On April 16, 2015, David Jaffee at Pangea sent an email to Ms. Burns at CHA stating, in part: "We've discussed this internally and think the request creates an undue burden on our company. We have been unable to identify where in the CHA program a landlord is required to provide this information." (*Id.* ¶ 6.) Ms. Burns responded the same day, as follows:

> We appreciate your responsibility to ensure the privacy of your residents, we too share that concern. What we are requesting is a copy of the rent rolls with names redacted that would allow us to be certain that there is no validity to complaints we are receiving regarding rental rates from our clients. This will not become a part of any regular process on our part, but will ultimately allow us to make a determination based upon facts.
>
> Please refer to your HAP contract for language that supports our demanding this information. It can be found in Section 6D (page 5) "During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere."
>
> Please let us know when we can expect this information. (*Id.* ¶ 7.)

Mr. Jaffee then sent an internal email to other Pangea executives setting forth some "initial thoughts" about a potential response, including:

> · If we decide we have to, I can set up road blocks to make analysis difficult—Limit info to building, unit, rent. Print to PDF, then rescan it so they can't scrape any data. Potentially even mail.
> · Remind them that rents will vary greatly depending on work done to the unit. Many of our tenants are still on inherited leases so the requested amount for a rehabbed unit may be higher than the inherited rents. (*Id.* ¶ 8.)

On the following day, April 17, 2015, Mr. Jaffee responded to Ms. Burns with an email which stated:

4

#154430272_v2

> [W]e were finally able to compile the requested information, but it appears the document exceeded your email size limit. We will mail the requested documentation to CHA's office first thing Monday.
>
> Please note prices can vary within unit types at the same building, depending on:
> · Whether a lease was inherited from a prior landlord or was signed by Pangea
> · Whether Pangea rehabbed the unit and the type of finish it received
> · The timing of when the lease was signed (as previously mentioned, pricing is dynamic and frequently changing)
>
> We believe this should help you in determining Pangea comps going forward, but would caution against using it as the only determining factor. The finishes on units still vary greatly and are a major factor in determining our requested rent. (*Id.* ¶ 9.)

On April 29, 2015, Ms. Burns emailed Mr. Jaffee, confirming that she had received the mailed data and asked for an electronic version that would be easier to manipulate:

> I have been able to look at what you sent, however I find it really unfriendly to manipulate. Can you send a thumb drive with this information? We really need an electronic version to be able to manipulate this much data. Otherwise I can have my ITS team work with yours so you can send through an ftp site. Let me know what method will work best for you. (*Id.* ¶ 10.)

Later that day Mr. Jaffee sent a series of four emails to Ms. Burns which contained the information. (*Id.* ¶ 11.)

The next morning, April 30, 2015, Ms. Burns sent Mr. Jaffee an email stating that, "[a]fter reviewing, I still think a thumb drive of this information will be better. Can you do that or ask your ITS team about uploading to an ftp site?" (*Id.* ¶ 12.) Mr. Jaffee responded, "I'm in Indianapolis visiting our properties down here for the next two days, but if you send the FTP instructions I should be able to figure that out with my IT team Monday." (*Id.* ¶ 13.) Ms. Burns replied, "I have copied Sheldon Hondras who is the Manager of our Network team in ITS. He can work with your ITS to send a zip file, but it has to be handled appropriately otherwise it won't come through. Can you connect him to someone on your end? By the way, we will need this document in Excel rather than a PDF." (*Id.* ¶ 14.)

5

#154430272_v2

Several days later, on May 5, 2015, Ms. Burns sent a follow-up message to Mr. Jaffee inquiring "[h]ave you identified a contact for Sheldon to work with on this?" (*Id.* ¶ 15.) Mr. Jaffee responded that day, stating in part that "[t]his information is not readily available in Excel, and it would create a serious burden on company resources for Pangea to provide it in this format." He added that "I'm happy to coordinate with our IT team to send the entire PDF, if you send the FTP instructions (they work on a ticketing system and I need to follow internal procedure)." (*Id.* ¶ 16.)

Ms. Burns responded on May 7, 2015, pushing Pangea to provide the requested information in Excel format. She stated:

> We appreciate the time your team has invested, however I must say it is critical that the CHA be able to review this information. Most software has an export to Excel option. I hope you can check to see if that is the case for your software. Otherwise if you can sort them by building and by bedroom size within a building please do that and send as separate files. Please send one file per building if an excel export is impossible. (*Id.* ¶ 17.)

Pangea may have submitted another (non-Excel) report to CHA in May or early June.[1] (*Id.* ¶ 18.) On June 15, 2015, Ms. Burns wrote to Mr. Jaffee, complaining that the information Pangea had provided was still inadequate.

> We have reviewed your submission and found that there are no unit numbers on this report, we are therefore unable to use it. As we have discussed previously, we need this information to perform our due diligence to complaints that have risen to our office as well as CHA's Office of Inspector General. I'm afraid if you refuse to submit this information you will leave me no choice but to recommend that CHA stop accepting RTA's [Requests for Tenancy Approval] from Pangea.
>
> Please provide this information by close of business, Friday, June 26th in either an .xls or .csv format.
>
> Please let me know if you will comply with this request. (*Id.* ¶ 19.)

---

[1] Pangea has no documentation of such a submission. Attached as exhibits to the Statement of Material Facts and Declaration of Krusha Evans are all non-privileged documents in the possession of the Pangea Defendants that relate to communications with CHA on the rent roll issue. (SOF ¶__)

#154430272_v2

On June 23, 2015, Mr. Jaffee transmitted extensive rent roll information to Ms. Burns in the form of a lengthy Excel spreadsheet titled "Pangea Rent Roll 6-23-2015." (*Id.* ¶ 20.) On July 23, 2015, Ms. Burns responded to Mr. Jaffee and stated:

> It has taken us an inordinate amount of time to sort through the data, we have reached a place where we will require more information from you. On the yellow highlighted rows of the attached we need you to address all duplicates and give us the exact post office address. For example 5723-34 W Washington. Please identify the street address and unit for the property. (*Id.* ¶ 21.)

An Excel spreadsheet titled "Cleaned Pangea Rent Roll 6-23-2015" was attached to Ms. Burn's email. (*Id.*)

On August 3, 2015, Mr. Jaffee transmitted the requested information to Ms. Burns in another, shorter Excel spreadsheet, titled "Pangea Rent Roll 8-3." He said in his cover email: "Apologies for the delay. Please see attached for the requested information." (*Id.* ¶ 22.) On August 4, 2015, Ms. Burns responded, "Thanks so much!" (*Id.* ¶ 23.)

That was the end of the matter. Thereafter, the Pangea Defendants heard nothing more from CHA about this issue. (*Id.* ¶ 24.) CHA continued to make Housing Assistance Payments to the Pangea Defendants for all of its units in the HCVP. (*Id.* ¶ 25.)

In sum, in April 2015, CHA raised with Pangea the issue of whether its rents for assisted units in the HCVP exceeded the rents charged for comparable unassisted units in the same premises. CHA sought rent roll information from Pangea to resolve this issue. Pangea was reluctant to provide the information but CHA was persistent and insistent about obtaining it. Ultimately, by August 3, 2015, Pangea provided sufficient rent roll information to satisfy CHA. That information demonstrated that, in some instances, the rents charged for assisted units exceeded the rent charged for comparable unassisted units in the premises. Nonetheless, CHA dropped the issue and continued to make payments to the Pangea Defendants.

7

## II. Relator's Admissions

Furthermore, relator has made repeated admissions that CHA continued to make housing assistance payments to the Pangea Defendants despite knowing "full well" that they were charging more for assisted units than comparable unassisted units in the same premises, and were falsely certifying to the contrary. These admissions appear throughout the SAC (Doc. 23):

> Mr. Muhawi learned that CHA has conspired with the Pangea Defendants in their fraud against HUD and the United States Government. More specifically, CHA is agreeing to and distributing housing assistance payments to the Pangea Defendants despite knowing that the Pangea Defendants are falsely certifying compliance with the requirement that they not charge more for assisted units than comparable unassisted units. (SOF ¶ 28.)
>
> Mr. Muhawi has learned that CHA is distributing HUD funds to the Pangea Defendants knowing full well that the Pangea Defendants are charging more for assisted units than comparable unassisted units in the same premises. (*Id.*)
>
> Mr. Muhawi has learned that CHA is aware that the Pangea Defendants are falsely certifying that they are not charging more for assisted units than they are for unassisted units in the same premises, and that CHA remits housing assistance payments to the Pangea Defendants despite knowing that the Pangea Defendants are falsely certifying compliance with this program requirement. (*Id.*)
>
> By distributing housing assistance payments to the Pangea Defendants, while knowing that the Pangea Defendants are in violation of their HAP contract requirements and relevant federal regulations, CHA has violated its statutory, regulatory, and contractual requirement to properly administer the Section 8 HCVP. (*Id.*)
>
> CHA is distributing housing assistance payments to the Pangea Defendants knowing that the Pangea Defendants are falsely certifying to their obligations not to charge higher rents to Section 8 tenants than they are charging to non-Section 8 tenants in comparable units. (*Id.*)
>
> As a further result of the Pangea Defendants' false statements and certifications, and CHA's decision and agreement to distribute housing assistance payments notwithstanding the Pangea Defendants' false statements and false certifications, HUD made monthly housing assistance payments to the Pangea Defendants that were higher than permitted under the terms of the HCVP. (*Id.*)

Relator specified that all of these allegations were based upon his personal knowledge. (*Id.* ¶ 29.)

In addition, relator advised the Court, in seeking leave to file the SAC, that he had "learned" that "CHA knows the Pangea Defendants are falsely certifying to their rent comparability requirement, but CHA is distributing federal housing assistance payments to them anyway …." (*Id. ¶* 30.) He explained that:

> Following the United States declination of intervention, counsel from Hodgson Russ LLP had several conversations with counsel for the United States. As a result of those conversations and further investigation, Mr. Muhawi learned that CHA is distributing federal housing assistance payments to the Pangea Defendants despite CHA knowing that the Pangea Defendants are falsely certifying compliance with federal regulations and HCVP requirements.

(*Id. ¶* 31.)

## ARGUMENT

### I. Legal Standard.

Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P.56(c). "A genuine issue of triable fact exists only if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *United States v. Navistar Int'l. Corp.*, 240 F.Supp.3d 789, 794 (N.D. Ill. 2017) (citation omitted).

### II. The Alleged False Certifications Are Not Material and Do Not Support a FCA Claim.

The evidence in this case fails to establish the existence of a material false claim. "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 181. The Supreme Court has called for "'strict enforcement of the Act's materiality … requirement[].'" *U.S. ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 842 (7th Cir. 2018) (quoting *Escobar*, 179 U.S. at 192).

"[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the

alleged misrepresentation.'" *Escobar*, 579 U.S. at 193 (citation omitted). "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* at 194. "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* "To meet the strict materiality standard, [plaintiff] must [show] that the violations at issue 'are so central ... that the [government] would not have paid these claims had it known of these violations.'" *United States v. UnitedHealthcare Ins. Co.*, 2018 WL 2933674, at *5 (N.D. Ill. 2018) (quoting *Escobar*, 579 U.S. at 196).

A defendant is "entitled to summary judgment [where the relator] failed to establish the independent element of materiality." *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016). In this case the undisputed evidence establishes that the alleged false certifications of the Pangea Defendants were not material because CHA continued to make housing assistance payments after learning that, contrary to those certifications, the Pangea Defendants sometimes were charging more for assisted units than for comparable unassisted units in the same premises.

**A.    Relator has admitted that CHA knew about the allegedly false certifications**

The Federal Rules explicitly provide that summary judgment may be based on party admissions. *See* Fed.R.Civ.P. 56(c)(1)(A). Indeed, party admissions have been described as "particularly compelling evidence" of the facts at issue. *Consolidation Services, Inc. v. KeyBank Nat. Ass'n*, 185 F.3d 817, 821 (7th Cir. 1999).

Here, the absence of a material false claim is established by relator's repeated admissions in the SAC that CHA continued to make housing assistance payments to the Pangea Defendants despite knowing "full well" that they were charging more for assisted units than comparable

10

unassisted units in the same premises, and were falsely certifying to the contrary. "An amended pleading does not operate as a judicial *tabula rasa*" and thus "'a party may offer earlier versions of its opponent's pleadings as evidence of the facts therein.'" *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1048 (7th Cir. 2019) (citation omitted). "[A]lthough 'prior pleadings cease to be conclusive judicial admissions, they are admissible in a civil action as evidentiary admissions.'" *Eastern Natural Gas Corp. v. Aluminum Co. of America*, 126 F.3d 996, 1001 (7th Cir. 1997) (quoting *Contractor Utility Sales Co. v. Certain-teed Products Corp.*, 638 F.2d 1061, 1084 (7th Cir. 1981)).

Further, relator made the same admissions in his motion for leave to file the SAC. He advised the Court that "CHA knows the Pangea Defendants are falsely certifying to their rent comparability requirement, but CHA is distributing federal housing assistance payments to them anyway …." (SOF ¶ 30.) He explained that, based on conversations with counsel for the United States about why it declined to intervene and his own further investigation, he "learned that CHA is distributing federal housing assistance payments to the Pangea Defendants despite CHA knowing that the Pangea Defendants are falsely certifying compliance with federal regulations and HCVP requirements." (SOF ¶ 31.) "[A]n 'admission' for purposes of summary judgment 'includes "anything which is in practical fact an admission," including statements made in a brief presented to the district court.'" *Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 756 (7th Cir. 2008) (quoting *Woods v. City of Chicago*, 234 F.3d 979, 989 (7th Cir. 2000)). Indeed, statements made in a motion for leave to amend a complaint have been treated as a binding judicial admission for purposes of summary judgment. *See Pierce v. City of Chicago*, No. 09-CV-1462, 2012 WL 401026, at *5 (N.D. Ill. Feb. 7, 2012); *see also Clark v. Robert W. Baird Co., Inc.*, 152 F.Supp.2d

11

1040, 1044 n. 2 (N.D. Ill. 2001) (a court may "consider statements of fact contained in a brief to be judicial admissions.").

While relator was able to avoid these admissions for purposes of Rule 12(b)(6) by filing the TAC, he cannot evade them for purposes of summary judgment. See *West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d at 172-73.[2]

### B.     The documentary evidence confirms relator's admissions

Moreover, relator's admissions that CHA knew all about the alleged false certifications are fully corroborated by the correspondence between CHA and the Pangea Defendants.

That correspondence shows that CHA investigated this issue after CHA and its Office of Inspector General received complaints about whether the rents charged by Pangea for assisted units exceeded the rent charged for comparable unassisted units in the same premises. CHA first sought the relevant rent roll information from Pangea in April 2015 and then doggedly pursued its inquiry until August 3, 2015, when it received sufficient information to resolve the issue. At that point CHA concluded its investigation without taking any action against the Pangea Defendants. Instead, CHA continued to make housing assistance payments to the Pangea Defendants.

This documentary evidence demonstrates conclusively that the alleged false certifications made by the Pangea Defendants were not material to the payment decision and therefore are not actionable under the False Claims Act. *See Escobar*, 579 U.S. at 181.

Notably, CHA's 2015 investigation of this issue was headed by a senior CHA official, Cheryl Burns, the Chief Housing Choice Voucher Officer. Ms. Burns provided a declaration to relator when CHA was dismissed from this suit, which relator then presented to the Court as an

---

[2] The Seventh Circuit has said that "a part[y] should be left within the knot of his averments in pleadings and admissions in testimony, unless the court can find an absolute demonstration from other evidence in the case or from facts within judicial notice, like the laws of physics, etc., that under no circumstances could the averments and admissions be true." *Uihlein v. General Elec. Co.*, 47 F.2d 997, 1005 (7th Cir. 1931).

12

exhibit to the TAC. (Doc. 64, pp. 41-43). This declaration discusses in general terms the operation of the HCVP and states that, "[i]n administering the HCVP, CHA relies on the truth and accuracy of the Owner's Certification, among other program requirements." (*Id.* ¶ 4). However, the Burns declaration is conspicuously <u>silent</u> about the facts of this case. It says <u>nothing</u> about whether CHA relied on the truth and accuracy of Owner's Certifications submitted by the Pangea Defendants. And it says <u>nothing</u> about whether CHA knew that, contrary to their Owner's Certifications, the Pangea Defendants were sometimes charging more for assisted units than for comparable unassisted units in the same premises. In sum, it carefully avoids the critical issue of CHA's knowledge. *See Cao v. Gonzales*, 442 F.3d 657, 661 (8th Cir. 2006) ("Because the [issue] is central to Cao's asylum claim, this omission from his wife's affidavit is notable.").

The truth of the matter is that CHA knew full well about the alleged false certifications by the Pangea Defendants and chose to keep making housing assistance payments to the Pangea Defendants despite knowing that, in some instances, the certifications were not correct. "Under these undisputed facts, [relator] cannot establish that [the certifications] were material falsehoods to obtain payment." *U.S. ex rel. Danielides v. Northrop Grumman Systems Corp.*, 2015 WL 5916871, at *9 (N.D. Ill. 2015). "[T]he most [relator] has shown is that [the Pangea Defendants'] supposed noncompliance and misrepresentations would have entitled the government to decline payment. Under [*Escobar*], that is not enough." *United States v. Sanford-Brown, Ltd.*, 840 F.3d at 448.

## CONCLUSION

Because CHA knew all about the alleged false certifications upon which this case is based, and nonetheless kept making housing assistance payments to the Pangea Defendants, relator's FCA claims fail and the Pangea Defendants are entitled to summary judgment.

13

#154430272_v2

Dated: January 27, 2022

Respectfully submitted,

Pangea Equity Partners, Pangea Equity Partners, LP, Pangea Equity Partners II, LP, Pangea Properties, Pangea Ventures, LLC, Pangea Real Estate, and Pangea Real Estate Holdings, LLC

By: /s/ Brian Hayes
      One of Their Attorneys

Brian Hayes [ARDC#6332059]
Holland & Knight LLP
150 N. Riverside Plaza, Ste. 2700
Chicago, IL 60606
312-263-3600
brian.hayes@hklaw.com