UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

UNITED STATES OF AMERICA, *ex rel.*
ANTONI MUHAWI,

        Plaintiff,

 v.

PANGEA EQUITY PARTNERS,
PANGEA EQUITY PARTNERS, LP,
PANGEA EQUITY PARTNERS II, LP,
PANGEA PROPERTIES,
PANGEA VENTURES, LLC,
PANGEA REAL ESTATE, and
PANGEA REAL ESTATE HOLDINGS, LLC,

        Defendants.

Case No.: 18-CV-02022
Hon. Manish S. Shah

---

# PLAINTIFF-RELATOR'S RESPONSES TO THE PANGEA DEFENDANTS' SUPPLEMENTAL STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1(b)(2) and the Court's Text Order (Dkt. No. 102), Plaintiff-Relator Antoni Muhawi ("Mr. Muhawi") responds to the Pangea Defendants' Supplemental Statement of Material Facts (Dkt. No. 104) as follows:

   1. The Chicago Housing Authority ("CHA") received a complaint from a tenant in January 2015 that Pangea was charging more for rent-assisted units under the Housing Choice Voucher Program ("HCVP") than for comparable unassisted units in the same premises. (Dkt. 97-1 (Burns Dep., Ex. 1 to Relator's SOAMF) at 32:1-33:2, 37:13-38:10; Ex. M hereto (Burns Dep. Ex. 6) at CHA-0000164; Ex. N. hereto (Burns Dep. Ex. 7).)

**RESPONSE:** Undisputed that CHA received a complaint from a tenant in or about January 2015, but disputed that the tenant broadly alleged "that Pangea was charging more for rent-assisted units under the Housing Choice Voucher Program ("HCVP") than for comparable

unassisted units in the same premises." The tenant made a specific complaint stating that she was shown a rental unit by the Pangea Defendants and quoted a price of $820, but when the Pangea Defendants learned she was an HCVP voucher holder, they informed her the rent would be $970. *See* Defendants' Supplemental Statement of Material Facts in Support of Motion for Summary Judgment, Dkt. No. 104, dated March 20, 2023 ("SSOMF"), Exhibit M, Dkt. No. 104-1, at CHA-0000164 (email from OIG investigator to Cheryl Burns describing the complaint); *see also* Plaintiff-Relator's Statement of Additional Material Facts in Opposition to the Pangea Defendants' Motion for Summary Judgment, Dkt. 97, dated February 17, 2023 ("SOAMF"), Exhibit 1 ("Burns Tr.") at 32:21-23 ("That's what it was. She alleged that they raised the amount of the rent that they would charge her when they learned she had a voucher."); Burns Tr. at 38:1-7.

2. CHA regarded this as a "fraud" issue and launched two investigations, one conducted by its Office of Inspector General ("OIG"), and one conducted by a team under the supervision of Cheryl Burns,. (Burns Dep. at 32:1-14; 38:11-39:6, 188:24-189:3, 10:2-23; Ex. M.)

**RESPONSE:** Undisputed.

3. Over the next nine months, Ms. Burns involved nearly a dozen CHA personnel, including herself and her boss, Kathryn Ludwig, in her investigation of this complaint. (Burns Dep. at 33:25-34:18, 63:7-17, 66:25-67:14, 140:7-141:21; 133:14-134:19.)

**RESPONSE:** Undisputed that numerous individuals worked with Ms. Burns during CHA's investigation of the Pangea Defendants in 2015. Disputed to the extent that the Pangea Defendants characterize all such individuals as "CHA personnel" because a number of the individuals were employees of CHA's outside vendors/contractors, including Nan McKay and Associates, Inc. and CVR Associates, Inc. *See* Burns Tr. at 63:7-14, 135:23-136:9, 140:4-141:21.

4. Following a meeting in April 2015, during which Ms. Burns and Ms. Ludwig met with representatives of Pangea and raised the issue of whether Pangea was charging more for assisted units than for comparable unassisted units, CHA requested rent rolls from Pangea so that it could examine that issue. (Burns Dep. at 34:2-21, 40:3-43:3, 44:7-25, 134:12-22; Dkt. 97-6 (Ex. 6 to Relator's SOAMF [Burns Dep. Ex. 18]) at CHA-0000155; Ex. N.)

**RESPONSE:** Undisputed.

5. Over the next five months, CHA continued to press Pangea for the production of this information and Pangea was slow to provide it. (Burns Dep. at 45:13-46:14; 46:22-47:12, 182:17-21, 58:20-59:10; Dkt 97-5 (Ex. 5 to Relator's SOAMF [Burns Dep. Ex. 9); Dkt. 97-6 at CHA-0000152-155; Ex. O hereto (Burns Dep. Ex. 10).

**RESPONSE:** Undisputed that the Pangea Defendants continuously failed to provide the requested information to CHA.

6. On June 15, 2015, Ms. Burns advised her boss, Ms. Ludwig, that Pangea had produced the requested information in a format that made it impossible to sort and compare, and had not included unit numbers so CHA could not determine whether a particular unit was assisted or unassisted. Ms. Burns concluded, "I think they are dragging their feet." (Burns Dep. at 46:22-47:12, 145:1-17; Ex. O. at CHA-000046; Ex. P hereto (Burns Dep. Ex. 42).)

**RESPONSE:** Undisputed that Ms. Burns emailed Ms. Ludwig on June 15, 2015, but disputed to the extent that the Pangea Defendants contend that Mr. Burns informed Ms. Ludwig that "Pangea had produced the requested information." Ms. Burns' June 15, 2015 email cited by the Pangea Defendants (SSOMF, Exs. O and P) does not include a statement informing Ms. Ludwig that the Pangea Defendants provided the requested information. Rather, the cited email shows that CHA had not received the information it requested, nor had CHA received information in a useable form. *See* SSOMF, Ex. O at CHA-0000046 and P at CHA-0000090; Burns Tr. 46:22-47:19, 49:13-25.

7. That same day, Ms. Burns wrote to Pangea stating that the information it had provided was still inadequate, and threatening that CHA would stop accepting new Requests for Tenancy Approval from Pangea unless the requested information was forthcoming by June 26, 2015. (Burns Dep. at 49:13-50:11; Dkt. 97-5 at CHA-0000172; Dkt. 97-6 at CHA-0000154.)

**RESPONSE:** Undisputed.

8. Pangea then transmitted extensive rent roll information to CHA on June 23, 2015, in the form of a lengthy Excel spreadsheet. (Burns Dep. at 50:12-51:6; Dkt. 97-5 at CHA-0000171; Dkt. 97-6 at CHA-0000153.)

**RESPONSE:** Undisputed that the Pangea Defendants transmitted their first Excel spreadsheet with rent roll information to CHA on June 23, 2015. Disputed to the extent this statement of fact characterizes the transmission as "extensive rent roll information." The June 23, 2015 rent roll contained much unusable and inconsistent information. *See* SOAMF at ¶ 18; *see also* Plaintiff-Relator's Local Rule 56.1 Responses to the Pangea Defendants' Statement of Material Facts, dated February 17, 2023, Dkt. 96 ("Resp. to SOMF") at ¶ 20.

9. A month later, on July 23, Ms. Burns wrote to Pangea saying "[i]t has taken us an inordinate amount of time to sort through the data, we have reached a place where we will require more information from you," and attaching a copy of the Pangea spreadsheet with highlighted rows of the additional information that CHA required. (Burns Dep. at 54:18-55:8; Dkt. 97-6 at CHA-0000152.)

**RESPONSE:** Undisputed that Ms. Burns' July 23, 2015 email to the Pangea Defendants contained the quoted language. Disputed to the extent that this statement of fact mischaracterizes the remainder of the cited email. Ms. Burns' email requested more than simply "additional information." It requested that the Pangea Defendants address the duplicative information in highlighted rows and provide specific mailing addresses, including unit numbers. *See* SOAMF, Ex. 6 at CHA-0000152 ("On the yellow highlighted rows of the attached we need you to address all duplicates and give us the exact post office address. For example, 5723-34 W Washington. Please identify the street address and unit for the property.").

4

10. On August 3, 2015, Pangea transmitted the requested information to Ms. Burns in another Excel spreadsheet. (Burns Dep. at 58:20-59:10; Dkt. 97-6 at CHA-0000152.)

**RESPONSE:** Undisputed that the Pangea Defendants transmitted rent roll information to CHA on August 3, 2015. Disputed to the extent that the Pangea Defendants contend that the transmission contained the "requested information." CHA asked the Pangea Defendants to address duplicate entries and provide exact post office mailing addresses. *See* Response to No. 9 above. The spreadsheet that the Pangea Defendants transmitted on August 3, 2015 contained only a portion of the data originally sent to CHA, with different column headings, and it still listed units by building range. Therefore, it was not the "requested information." Burns Tr. at 59:4-61:18; *see also* SOAMF at ¶ 19-22; Resp. to SOMF at ¶ 22.

11. On September 9, 2015, two CHA analysts wrote to Ms. Burns summarizing their analyses of the Pangea rent roll data. (Burns Dep. at 70:7-71:18, 74:23-76:12, 164:23-165:14, 167:8-168:13; Dkt. 97-7 (Ex. 7 to Relator's SOAMF [Burns Dep. Ex. 19]) at CHA-0000362-364; Dkt. 97-8 (Ex. 8 to Relator's SOAMF [Burns Dep. Ex. 20]) at CHA-0000367-370; Dkt. 97-10 (Ex. 10 to Relator's SOAMF [Burns Dep. Ex. 22]).)

**RESPONSE:** Undisputed that Russell Leslie and Tessa Huttenlocher, two CHA analysts, wrote to Ms. Burns on September 9, 2015 summarizing their analysis of the Pangea Defendants' August 3, 2015 rent roll information. *See* SOAMF at ¶¶ 24 and 28. Disputed to the extent this statement of fact suggests that either analysis was a final conclusion on behalf of CHA or a determination that violations of Owner's Certifications had occurred. *See id.* at ¶¶ 24-32.

12. The first analyst stated that, after comparing the Pangea rent roll to CHA's own data, he had found 40 HCVP units where the rent was higher than comparable non-assisted units, 9 HCV units where it was lower, two units where there was no comparable information, and he noted that "[t]here is a significant difference in the amount change [charged] for the majority of the units." (Burns Dep. at 164:23-167:5; Dkt. 97-8 at CHA-0000367.)

**RESPONSE:** Undisputed that this statement of fact refers to Mr. Leslie's September 9, 2015 cover email to Ms. Burns where he summarized his analysis of the Pangea Defendants' August

5

3, 2015 rent roll information. Mr. Muhawi detailed this in SOAMF paragraph 24, which the Pangea Defendants admitted in their response. *See* Defendants' Response to Plaintiff-Relator's LR 56.1(b)(3) Statement of Additional Facts, dated March 20, 2023, Dkt. 105 ("Def. Resp. to SOAMF") at ¶ 24. Disputed with respect to the Pangea Defendants' insertion of "[charged]" in the quoted language because there is no record evidence cited that Mr. Leslie testified to that clarification. Further disputed to the extent this statement of fact suggests that Mr. Leslie's September 9, 2015 analysis was a final conclusion on behalf of CHA or a determination that violations of Owner's Certifications occurred. *See* SOAMF at ¶¶ 24-32.

13. The second analyst stated that 42 out of 52 Pangea units in the HCVP had higher rents than the average rent for comparable unassisted units in the same building and added that, "[n]etting all deviations between HCV[P] rents and market rate rents shows that we are potentially losing upwards of $4,000 each month." (Burns Dep. at 167:8-169:12; Dkt. 97-10.)

**RESPONSE:** Undisputed that this statement of fact refers to Ms. Huttenlocher's September 9, 2015 cover email to Ms. Burns where Ms. Huttenlocher summarized her analysis of the Pangea Defendants' August 3, 2015 rent roll information. Mr. Muhawi detailed this in SOAMF paragraph 28, which the Pangea Defendants admitted in their response. *See* Def. Resp. to SOAMF at ¶ 28. Disputed to the extent that this statement of fact suggests that Ms. Huttenlocher's September 9, 2015 analysis was a final conclusion on behalf of CHA or a determination that violations of Owner's Certifications occurred. *See* SOAMF at ¶¶ 24-32.

14. These reports concerned Ms. Burns and raised questions, so that same day, she asked her assistant to schedule a half-hour meeting with the first analyst to discuss his report. (Burns Dep. at 164:23-165:14, 166:8-167:5, 168:11-169:2; Dkt. 97-8 at CHA-0000367.)

**RESPONSE:** Undisputed.

15. On September 11, 2015, the first analyst again wrote Ms. Burns, this time reporting that Pangea had 1130 units in the HCVP, that many of those were not included in the rent roll data that Pangea had provided, and recommending that CHA obtain a complete list from Pangea with U.S. Postal Service addresses so that they could be matched against CHA's database. (Burns Dep. at 181:1-25; 183:11-14; Dkt. 97-11 (Ex. 11 to Relator's SOAMF [Burns Dep. Ex. 53]).)

**RESPONSE:** Undisputed that Mr. Leslie sent Ms. Burns an email to this effect on September 11, 2015. *See* SOAMF at ¶ 33, Ex. 11.

16. On September 14, 2015, Ms. Burns asked the two analysts to work together to write up a methodology and summary of findings on the Pangea project, and both analysts responded that same day. (Burns Dep. at 83:4-84:14; Dkt. 97-12 (Ex. 12 to Relator's SOAMF [Burns Dep. Ex. 25]); Ex. Q hereto (Burns Dep. Ex. 24).)

**RESPONSE:** Undisputed. *See* SOAMF at ¶ 34.

17. The analysts had found some 50 HCVP units in a subset of the Pangea data that they could compare to non-assisted units in the same buildings, and for approximately 80 percent of those assisted units, Pangea appeared to be charging more for assisted units than it charged on average for unassisted units. (Burns Dep. at 164:23-166:7, 167:8-25, 168:11-169:2, 182:24-183:5; Dkt. 97-8 at CHA-0000367; Dkt. 97-10; Ex. Q.)

**RESPONSE:** Undisputed that Mr. Leslie and Ms. Huttenlocher identified approximately 50 HCVP units from the Pangea Defendants' August 3, 2015 rent roll information where it appeared approximately 40 of those units had rental rates listed that were higher than the average rent for a comparable unit in the same building. Disputed to the extent that this statement of fact suggests Mr. Leslie's or Ms. Huttenlocher's analyses were final conclusions on behalf of CHA or a determination that violations of Owner's Certifications had occurred. *See* SOAMF at ¶¶ 24-32.

18. The analysts found this rent differential could be costing CHA upwards of $4,000 a month just on that subset of 50 units, and the data they analyzed had not included all of the units Pangea had in the HCVP (Burns Dep. at 167:8-25, 168:14-169:12, 181:1-25, 183:11-14; Dkt. 97-10; Dkt. 97-11; Dkt. 97-12.)

**RESPONSE:** Undisputed that the Pangea Defendants did not provide complete data to CHA with all of their HCVP units such that both Mr. Leslie's and Ms. Huttenlocher's analyses were

7

conducted on only a portion of the Pangea Defendants' HCVP units. *See* SOAMF at ¶ 33, Ex. 11. Also undisputed that Ms. Huttenlocher's analysis included a statement that said "[n]etting all deviations between HCV rents and market rate rents shows that we are potentially losing upwards of $4,000 each month." *See* SOAMF, Ex. 10 (bold removed). Disputed to the extent that this statement of fact suggests Mr. Leslie's or Ms. Huttenlocher's analyses were final conclusions on behalf of CHA or a determination that violations of Owner's Certifications had occurred. *See* SOAMF at ¶¶ 24-32.

19. On November 2, 2015, Ms. Burns forwarded to her supervisor, Ms. Ludwig, the September 11 email from the first analyst noting that the rent roll information provided by Pangea was incomplete and suggesting that a complete list be obtained, stating, "Katie, per our discussion this was the last report Russell provided to me." (Burns Dep. at 87:18-88:23; 175:20-176:5; Ex. R hereto (Burns Dep. Ex. 26) at CHA-0000411.)

**RESPONSE:** Undisputed.

20. CHA did not seek any additional information from Pangea or take any additional action following the analyst's recommendation, though it could have continued the investigation and requested the additional documents its analyst suggested. (Burns Dep. at 86:2-18, 189:23-190:24.)

**RESPONSE:** Undisputed that CHA did not seek additional information from the Pangea Defendants, but disputed as to the remainder of the statement. Although Ms. Burns testified that further information could have been requested from the Pangea Defendants, she also testified that CHA decided to continue relying on the Pangea Defendants' Owner's Certifications. *See* Burns Tr. at 86:2-87:3.

21. CHA's Administrative Plan for the HCVP provides that, whenever it conducts an investigation, the agency will determine (1) whether an error or program abuse has occurred, (2) whether any amount of money is owed the CHA, and (3) what corrective measures or penalties will be assessed. (Burns Dep. at 187:25-189:22; Ex. S hereto (CHA Admin. Plan for Hous. Voucher Program) at 14-4.)

**RESPONSE:** Undisputed.

22. Burns testified that Pangea was the largest landlord in the voucher program and that she did not encounter any investigations similar to the investigation of Pangea during her 12-year career at CHA. (Burns Dep. at 113:18-114:14, 128:18-24, 196:21-23; see also, Ex. T (Ludwig Dep.) at 21:14-16.)

**RESPONSE:** Undisputed.

23. Ms. Burns testified that CHA had not made any of the determinations prescribed by the CHA Administrative Plan for the HCVP with respect to Pangea. (Burns Dep. at 187:21-191:4, 190:15-17.).)

**RESPONSE:** Undisputed.

24. The agency halted the investigation for reasons that Ms. Burns did not recall and could not explain. (Burns Dep. at 86:2-18, 88:24-89:7, 184:9-185:11, 187:14-20, 196:11-20.)

**RESPONSE:** Disputed as to the characterization of Ms. Burns' testimony. Ms. Burns testified that the investigation ended because the data was inconclusive. CHA could not determine whether violations of Owner's Certifications occurred, so CHA chose to continue relying on the Owner's Certifications submitted by the Pangea Defendants. Burns Tr. at 86:2-87:3, 184:9-14.

25. CHA continued to make housing assistance payments to the Pangea Defendants, without interruption. (Burns Dep. at 192:12-17, 23-25.)

**RESPONSE:** Undisputed that CHA continued to make housing assistance payments to the Pangea Defendants during and following its 2015 investigation. Disputed to the extent that the Pangea Defendants contend that payments were made "without interruption" because that information is outside the scope of the limited discovery allowed by the Court. *See* Dkt. No. 84. Also disputed to the extent that this statement suggests that CHA made housing assistance payments with knowledge of false Owner's Certifications. CHA reached no final conclusion in its 2015 investigation, and CHA never made housing assistance payments with knowledge that the Pangea Defendants falsified Owner's Certifications. *See* SOAMF at ¶¶ 27, 29, 37-39.

Dated: April 3, 2023

Respectfully submitted,

**HODGSON RUSS LLP**
*Attorneys for Plaintiff-Relator Antoni Muhawi*

By: /s/Patrick E. Fitzsimmons
    Robert J. Fluskey (*pro hac vice*)
    Patrick E. Fitzsimmons (*pro hac vice*)
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
716.856.4000
*rfluskey@hodgsonruss.com*
*pfitzsimmons@hodgsonruss.com*

**ARENTFOX SCHIFF LLP**
*Attorneys for Plaintiff-Relator Antoni Muhawi*
William P. Ziegelmueller
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
312.258.5500
*bill.ziegelmueller@afslaw.com*