### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA, *ex rel*.
ANTONI MUHAWI,

        Plaintiff,

   v.

PANGEA EQUITY PARTNERS,
PANGEA EQUITY PARTNERS, L.P.,
PANGEA EQUITY PARTNERS II, L.P.,
PANGEA PROPERTIES,
PANGEA VENTURES, LLC,
PANGEA REAL ESTATE, and
PANGEA REAL ESTATE HOLDINGS, LLC,

        Defendants.

No. 18 CV 2022

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Antoni Muhawi alleges that his former employer—a landlord of multi-family apartment buildings—violated the False Claims Act by charging higher rents to people who used federal housing vouchers than to other tenants and submitting documents to the Chicago Housing Authority certifying it did not do so. The defendants responded to Muhawi's third amended complaint with a motion for summary judgment arguing that the certifications were immaterial because the Chicago Housing Authority knew that they were charging higher rent to voucher holders and continued making housing assistance payments to them anyway. The motion for summary judgment is denied because there are factual issues about the extent of the Chicago Housing Authority's knowledge of defendants' rent practices.

## I.  Legal Standards

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'Material' facts are facts that 'might affect the outcome of the suit,' and a dispute as to those facts is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hunter v. Museke*, 73 F.4th 561, 565 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "On summary judgment the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." *Adickes v S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). The court does not, however, make credibility determinations, weigh the evidence, or decide which inferences to make from the facts; those are jury functions. *Anderson*, 477 U.S. at 255.

## II.  Facts

The Chicago Housing Authority administers several programs to help people afford housing. One of those is the Housing Choice Voucher Program, which uses federal funds through the Department of Housing and Urban Development to help

people afford rent in the private housing market. [96] ¶ 1; [105] ¶ 1.[1] Pangea[2] owned many apartment buildings in the Chicago area and was landlord to thousands of voucher holders. [96] ¶ 2. While participating in the voucher program, Pangea dealt directly with the CHA. *Id.*

For CHA to make the monthly Housing Assistance Payment to a landlord whose tenant was using a voucher, the landlord had to certify that it was not charging more in rent to voucher holders than for comparable unassisted units in the same premises. [105] ¶ 1. This certification was called the "Owner's Certification" and was required by HUD. [105] ¶ 2. The Owner's Certification was in the contract between the landlord and CHA, the paperwork a landlord submitted to the CHA, federal regulations, and CHA's own internal rules. [105] ¶ 4. Each time an owner received

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed on the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from the parties' responses to Local Rule 56.1 statements of fact where both the asserted fact and response are set forth in one document. [96], [105], [106]. Pangea makes repeated objections on the basis that evidence is immaterial because it has to do with CHA's general operations or Pangea's internal operations. *See* [105] ¶¶ 5, 6, 7, 8, 9, 11, 12, 13, 15, 16. I overrule those objections. How the Housing Choice Voucher program worked is important context for the case and Pangea's knowledge of the program's requirements is relevant to a finding of materiality. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 ("what matters is … whether the defendant knowingly violated a requirement that the defendant knows is material to the government's payment decision."). Pangea also objects to CHA's Federal Rule of Civil Procedure 30(b)(6) witness's deposition testimony as speculative, conclusory, and lacking foundation. *See* [105] ¶¶ 5, 6, 7, 8, 9, 12, 36, 38. I address those arguments in the body of the opinion. Muhawi "notes" that several of the emails cited in Pangea's statements contain further unquoted correspondence. *See* [96] ¶¶ 3, 4, 6, 8, 16. But Muhawi does not state why (or if) the unquoted correspondence makes a difference to the asserted statement, so the "note" is ignored. General objections to how facts are characterized, *see* [106] ¶¶ 6, 8, 9, 10 *and* [96] ¶¶ 20, 22, *and* [105] ¶¶ 15, 18, 20 are sustained and I omit the characterizations and cite to the original language when possible.

[2] For the sake of simplicity, I refer to all of the defendants as "Pangea." No one has set forth arguments or facts that require the defendants to be treated differently.

the monthly housing assistance payment from CHA, it certified that it did not charge more for an assisted unit than for a comparable unassisted unit in the same premises. [105] ¶ 5. CHA relied on the truth and accuracy of the Owner's Certification when making payments to participating landlords, including Pangea. [105] ¶ 6.[3] If CHA knew that a participating landlord made false certifications, it would not continue making housing assistance payments to that landlord. [105] ¶ 7.

The rental process for voucher holders required the landlord of a prospective unit to submit a Request for Tenancy Approval to the CHA; the form included a section where the landlord listed comparable unassisted units within the same building and the rent charged. [105] ¶ 8; *see* [97-3] at 3. CHA's corporate representative testified that if CHA knew that a participating landlord had lied on the Request, it would not approve the tenancy. [105] ¶ 8. If the Request for Tenancy Approval was approved, the landlord, the voucher holder, and CHA entered into a "Housing Assistance Payment" contract. [105] ¶ 10. This contract read, in part: "During the term of this contract, the owner certifies that … (c) The rent to owner

---

[3] Pangea argues that ¶ 6 is refuted by evidence that CHA investigated whether Pangea lied on Owner's Certifications, terminated the investigation inconclusively instead of continuing the investigation, and continued to make housing assistance payments to Pangea without interruption. [105] ¶ 6. This does not refute or controvert the assertion that CHA relied on the Owner's Certifications and did not waive Pangea's duty to honestly complete them. The evidence cited by Pangea invites a factfinder to make an inference, based on CHA's behavior, that CHA did not rely on the information or waived the requirement to fill them out honestly. I make no such inferences at this stage, so Pangea's objection is overruled.

does not exceed rents charged by the owner for rental of comparable unassisted units in the premises." [97-4] at 6–7 (Part B ¶ 8(c)); [105] ¶ 11.[4]

Pangea was required to accurately and truthfully fill out and submit Requests for Tenancy Approval and CHA relied on the veracity of the information. [105] ¶ 9.[5] Pangea also entered into Housing Assistance Payment contracts with the CHA and the CHA relied on the Owner's Certifications in those documents. [105] ¶ 12. The CHA did not waive the Owner's Certification requirements for Pangea. [105] ¶¶ 3, 6, 9, 12.

In January 2015, a voucher holder complained to the CHA that Pangea had raised the quoted rent for a unit when they learned she was a voucher holder. [104-1] at 3; [106] ¶ 1.[6] Cheryl Burns, who was then the senior director of the voucher

---

[4] Pangea objects to ¶ 11 as containing a legal conclusion because it is an interpretation of the contract. [105] ¶ 11. It's not. The assertion accurately repeats the contract language, and is not an interpretation. See [97-4] at 6 (Part B ¶ 6(a)) ("the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises"); [97-4] at 10 (Part C ¶ 4(c)(2)) ("the rent to owner may at no time exceed (2) Rent charged by the owner for comparable unassisted units in the premises"). Pangea's objection is overruled.

[5] Pangea objects to a portion of ¶ 9 on the basis that it is not supported by the record. [105] ¶ 9. I overrule the objection; Burns's testimony supports the assertion that Pangea had to accurately and truthfully fill out tenancy approval requests, that CHA relied on the information in the requests, and that CHA did not waive the requirement for Pangea to fill out the requests truthfully and accurately. See [97-1] at 25:21–26:17. Moreover, Pangea cites evidence about the CHA investigation into Pangea to controvert ¶ 9. See [97-1] at 182:17–183:5, 190:3–7. This evidence does not directly controvert Burns's testimony; it supports an inference in Pangea's favor to be drawn from CHA's behavior, which I do not do at summary judgment. See FN 3, above.

[6] Muhawi objects to ¶ 1 on the basis that the CHA received a complaint about one tenant's rent being increased when she stated that she was a voucher-holder, not a complaint that "Pangea was charging more for rent-assisted units under the Housing Choice Voucher programs than for comparable unassisted units in the same premises." [106] ¶ 1. I agree that the cited sources support only that there was one participant who complained that Pangea had charged her more rent after it learned she had a voucher. See [104-1] at 3 and [97-1] at

5

program, began an investigation into Pangea; the CHA's Office of Inspector General also investigated the issue. [106] ¶ 2; [105] ¶ 13. After a meeting with Pangea staff, Burns emailed Pangea in April 2015 and asked for rent rolls of the Pangea buildings that housed voucher participants. [96] ¶ 4; [105] ¶ 14; [106] ¶ 4. A CHA employee also emailed Pangea to say that all future Requests for Tenancy Approval would need to include a rent roll. [96] ¶ 3.

After receiving CHA's request, Pangea's CFO sent an internal email stating, "Oh sh*t, not good news … Definitely can't send all rent rolls as is. Probably need to dig in and identify some possible, selected rent rolls that show the least variance from market for our [Section 8] guys. Is that what you're thinking to provide?" [105] ¶ 15. Three days later, Pangea's Operations Manager, David Jaffee, emailed Burns and denied the request, saying, "We've discussed this internally and think the request creates an undue burden on our company. We have been unable to identify where in the CHA program a landlord is required to provide this information." [96] ¶ 6. When Burns responded by citing the portion of the Pangea-CHA contracts that give CHA the right to ask for the information, [96] ¶ 7, Jaffee wrote an internal email with initial thoughts on how to respond, [96] ¶ 8[7]; [105] ¶ 16:

> If we decide we have to, I can set up road blocks to make analysis difficult—Limit info to building, unit, rent. Print to PDF, then rescan it so they can't scrape any data. Potentially even mail. Remind them that

---

32:17–33:2, 37:13–38:10. The complaint was not that the rent was more than another unit, just that it was more than previously charged for the same unit. The objection is sustained.

[7] Muhawi objects to the redaction of portions of this email from Jaffee to other Pangea employees because he thinks Pangea waived attorney-client privilege by producing a portion of the email. [96] ¶ 8; *see* [70-9] at 2 *and* [77-1] ¶¶ 19–20. Muhawi has not argued why the wrongfully redacted information might be material to this motion, so I overrule the objection.

rents will vary depending on work done to the unit. Many of our tenants are still on inherited leases so the requested amount for a rehabbed unit may be higher than the inherited rents. I can also start compiling the damage here to see how d*mning the evidence is if you think it's worth it.

In mid-April, Pangea mailed CHA hard copies of the rent rolls. [96] ¶ 9; [105] ¶ 17. Burns asked Jaffee for an electronic version of the documents so that her staff could analyze the data. [96] ¶ 10. Jaffee resisted sending the information in an Excel spreadsheet, or with unit numbers so that CHA could compare rents for assisted and unassisted units. [96] ¶¶ 11–18; [105] ¶ 17. Burns threated to recommend that CHA stop accepting tenancy approval requests from Pangea, and in late June, Jaffee sent in an Excel spreadsheet, labeled "Pangea Rent Roll 6-23-2015." [96] ¶¶ 19–20.[8]

The June 23 spreadsheet had inconsistent data that was hard to use; for instance, many of the apartments were listed by building range instead of postal mailing address. [105] ¶ 18. In July 2015, Burns asked for more information: "On the yellow highlighted rows of the attached [spreadsheet] we need you to address all duplicates and give us the exact post office address." [96] ¶ 21; [106] ¶ 9. The CHA needed the information to "determine which of these units were voucher units … figure out which ones were ours and compare them or look at them as compared to the others." [105] ¶ 19.

---

[8] I accept Muhawi's general objection that he cannot accept or deny whether Exhibits E [70-5], L [70-12], F [70-6], are in fact the attachments to the correspondence, because the exhibits are not in their original format. *See* [96] ¶¶ 20, 21, 22. But there's no dispute about the content of the spreadsheets and their authenticity is immaterial to the parties' positions on Pangea's motion.

Jafee sent a second spreadsheet titled "Pangea Rent Roll 8-3" to Burns on August 3, 2015. [96] ¶ 22; [106] ¶ 10. This spreadsheet contained 748 rows of rental data, as opposed to the 7,188 rows of rental data on the first spreadsheet, and some units were still listed by building range rather than postal address. [105] ¶¶ 18, 20. Burns thanked Jaffee for sending the information and Pangea did not receive any further requests for information. [96] ¶¶ 23–24. The CHA did not seek any additional information from Pangea or take any additional action, although it could have asked for more information. [106] ¶ 20.[9]

CHA analysts reviewed the August 3 data and told Burns that "[e]ven with their revised addresses, there are still some listed [by building range and] some that do not correlate with the original addresses in column A at all." [105] ¶ 21; [97-6] at 2. One of the analysts said, "I just want to emphasize that this data sent to us is very inconsistent. We noticed on the spreadsheet that the building address originally given to CHA did not match Pangea's Street Address audit. For example, one unit will say the building address is '8001-03 S May St' but the street address Pangea gives us is '1115 W 80th St.'" [105] ¶ 22.

Burns asked two CHA analysts, Russell Leslie and Tessa Huttenlocher, to help her review the August 3 rent roll and Leslie emailed her in early September with a summary of their analysis. [105] ¶¶ 23–24; [106] ¶ 11. The summary stated that there

---

[9] Muhawi objects to ¶ 20 on the basis that Burns *also* testified that CHA decided to continue relying on Pangea's Owner Certifications. [106] ¶ 20. The fact that CHA decided to continue relying on the Owner Certifications does not controvert the assertion that CHA could have asked for more information, so the objection is overruled.

were 51 units that used a voucher; of those 40 had a rent "higher than the comparable Pangea unit that are non-[voucher]," nine units where the rent was lower, and two units where there was no comparable information. [105] ¶ 24; [106] ¶ 12. Burns asked her assistant to set up a meeting with Leslie; the record does not reflect whether that meeting occurred. [106] ¶ 14. Huttenlocher emailed Burns to report that "42 out of Pangea's 52 [voucher] units have rents that are greater than the average market rent for comparable units in the same building." [105] ¶ 28; [106] ¶ 13. Huttenlocher wrote, "Netting all deviations between [voucher] rents and market rate rents shows that we are potentially losing upwards of $4,000 each month." [105] ¶ 28; [106] ¶ 18.

Several days later Leslie emailed Burns to inform her that he had run a report on CHA's internal data which showed that Pangea had 1,130 units using Housing Choice Vouchers, not the 51 (or 52) reflected in the August 3 rent roll. [105] ¶ 33. Leslie suggested that CHA should "request the data for all Pangea and its Holdings to obtain a complete list. Also, the list they [send] should [ ] contain the USPS addresses." [105] ¶ 33; [106] ¶ 15.

Burns asked the analysts to send her a summary of their methodology and findings; in response they wrote:

> In analyzing the Rent Roll from Pangea we were left with many questions. Our initial finding included several units (50) where there was a difference in the amount of rent Pangea charged for [voucher] and non-[voucher] participant in the same building where unit bedroom size and bath number were identical. Further investigation reveals a discrepancy in the number of unit that are [in the voucher program] under Pangea's Portfolio and the number provided.
> …
> It appears that the data provided by Pangea is not complete because in that data we could only identify 75 units. A big difference compare[d] to

the 1130 unit in Yardi … Our units are listed in Yardi with the USPS address and apt # and Pangea only provided units by buildings.

[105] ¶ 34; *see also*, [106] ¶¶ 16–17 *and* [104-5] (different email chain between Burns and analysts regarding methodology and summary of findings). In November, Burns forwarded Leslie's email to her supervisor, noting that the rent roll information was incomplete and suggesting CHA obtain a complete data set; she wrote, "Katie, per our discussion this was the last report [Leslie] provided to me." [106] ¶ 19.

No conclusions were drawn from Huttenlocher's analysis because the CHA did not have "enough data to really make a final conclusion." [105] ¶ 29. Further, Huttenlocher's analysis was not a true rent comparison because the data did not include lease start dates, and a proper rent comparison for Owner's Certification purposes requires lease start dates. [105] ¶¶ 30–31.[10] Huttenlocher also used an average of market-rate rents in her analysis, not the lowest rent for a comparable unit. [105] ¶ 30. As for Leslie's analysis, he was not responsible for determining what was a "comparable unassisted unit" under the Housing Choice Voucher program and he did not know that the lease start date was required in order to make a proper rental comparison. [105] ¶¶ 25–26. To Leslie's knowledge, no CHA employees reached conclusions about whether Pangea violated the Owner's Certification requirements. [105] ¶ 39.

---

[10] Pangea did not provide lease start data to CHA. [105] ¶ 32. Pangea notes that CHA never asked for lease start data but does not cite any evidentiary support for its statement. *See* [105] ¶ 32.

Burns, testifying as CHA's Rule 30(b)(6) witness, said that the investigation into Pangea ended with no final determination; the CHA never reached a conclusion on whether Pangea was violating the Owner's Certification requirement to charge voucher holders the same rent as comparable unassisted units. [105] ¶¶ 35, 37. Burns did not remember why CHA stopped investigating the issue. [106] ¶ 24.[11] Pangea was the largest landlord in the voucher program and Burns did not encounter any similar investigations during her 12-year career at CHA. [106] ¶ 22.

The CHA's rules and guidelines for the Housing Choice Voucher Program are in its administrative plan. The plan provides that a CHA investigation "will determine (1) whether an error or program abuse has occurred, (2) whether any amount of money is owed the CHA, and (3) what corrective measures or penalties will be assessed." [104-7] at 21; [106] ¶ 21. The CHA did not make any of those determinations at the end of its 2015 investigation into Pangea's possibly false Owner's Certifications. [106] ¶ 23.

Pangea asserts that it provided sufficient rent roll information to "satisfy" CHA by August 2015 and that CHA "dropped the issue"; this characterization of the facts is disputed by Muhawi. *See* [96] ¶¶ 26–27. Whether the CHA was satisfied is a matter of inference and not compelled by Pangea's evidence. The CHA continued to make housing assistance payments to Pangea on behalf of voucher holders and continued to rely on Pangea's Owner Certifications during and after the 2015 investigation. [96]

---

[11] The cited testimony, [97-1] at 187:14–20, supports the assertion that Burns did not remember why CHA stopped the investigation.

¶ 25; [105] ¶ 36; [106] ¶ 25. The CHA never made housing assistance payments to Pangea knowing that Pangea was charging more to assisted units than comparable unassisted units. [105] ¶ 38.[12] CHA did not report any findings to HUD or the federal government regarding the 2015 investigation of Pangea. [105] ¶ 40.

## III.  Analysis

The False Claims Act prohibits knowingly presenting false or fraudulent claims for payment to the United States, using false records or false statements material to that claim, or using false records to conceal an obligation to pay money to the United States. *See United States ex rel. Prose v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732, 739 (7th Cir. 2021). The statute allows private parties to sue on behalf of the government for fraud and receive a share of the money paid back to the government. *Id*. To be successful with such a suit, the private party must prove: "1) the defendant made a false statement (falsity); 2) the defendant knew the statement was false (knowledge); 3) the false statement was material to the government's payment decision (materiality); and 4) the false statement caused the government's loss (causation)." *United States ex rel. Calderon v. Carrington Mortg. Servs., LLC*, 70 F.4th 968, 973 (7th Cir. 2023) (internal citation omitted).

"Materiality" under the False Claims Act is defined in the same manner as other federal fraud statutes: "having a natural tendency to influence, or be capable of

---

[12] Pangea objects to ¶¶ 36 and 38 because it contends that Burns's testimony is refuted by other evidence in the record. [105] ¶¶ 36, 38. As discussed in FN 3, above, Pangea is not submitting evidence that directly controverts Burns's testimony. Instead Pangea invites a factfinder to make an inference, based on CHA's behavior, that CHA did not rely on the information or that it made payments knowing that Pangea was making false certifications. I make no such inferences at this stage, so Pangea's objection is overruled.

influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192–93 (2016). A false claim can be shown to be material in "two circumstances: (1) if a reasonable [person] would attach importance to it in determining [their] choice of action in the transaction; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not." *Calderon*, 70 F.4th at 976 (citing *Escobar*, 579 U.S. at 193 (internal citation omitted)).

A False Claims Act case may be brought on the grounds that the defendant falsely certified that it was compliant with a statutory, regulatory, or contractual requirement or did so impliedly by failing to disclose a violation of said requirement. *See Escobar*, 579 U.S. at 181, 186–87. Liability for a false disclosure or implied false disclosure requires that the statutory, regulatory, or contractual requirement be material to the government's decision to pay. *Escobar*, 579 U.S. at 181. How the statute, regulation, or contract describes the requirement is not dispositive of materiality, "[w]hat matters is … whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Escobar*, 579 U.S. at 181. "[I]f the Government pays a particular type of claim in full despite actual knowledge that certain requirements were violated … that is very strong evidence that those requirements are not material." *Id.* at 195. Ultimately, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (internal citation

13

omitted). Pangea argues that Muhawi cannot, as a matter of law, show that any false or fraudulent claim Pangea made was material to the government's decision to pay.

### A.    Conflicts of Fact Preclude Judgment as a Matter of Law

Muhawi has raised an issue of fact as to whether CHA knew that Pangea's Owner's Certificates were false. Specifically, Muhawi presented evidence that CHA did not come to a conclusion after its 2015 investigation as to whether Pangea was charging more rent to assisted units than for comparable unassisted units in the same building. *See* [105] ¶¶ 35, 37. Because there is a dispute about the extent of CHA's knowledge, there is also a dispute over whether CHA made housing assistance payments while knowing that Pangea was submitting false Owner's Certifications. *See* [105] ¶¶ 6, 9, 12, 38. Additionally, there are conflicts of fact about whether Pangea provided sufficient information for CHA to come to a conclusion about Pangea's rent disparities, *compare* [106] ¶¶ 26, 27 *with* [105] ¶¶ 17–22, 29, 37, 39. The long and short of it is: Pangea argues that CHA knew that it was submitting false certificates and made housing payments anyway, meaning that the certificates were not material to the government's decision to pay. Cheryl Burns, as CHA's Rule 30(b)(6) witness, testified that CHA did not make a final determination as to whether Pangea was violating the Owner's Certification requirement and never made housing assistance payments knowing that false certifications were made. [105] ¶¶ 37, 38. This is an issue of material fact that prevents the entry of summary judgment.

This case differs from *United States ex rel. Yannacopoulos v. General Dynamics*, where judgment as a matter of law was appropriate because the

government's knowledge of the false certification was not disputed—the government had a copy of the contract that lacked the required clause and defendant sent the government a letter stating that the parties to the contract did not intend to enforce the clause. *Id.*, 652 F.3d 818, 830–31 (7th Cir. 2011). The extent of CHA's knowledge of Pangea's rent practices is disputed, so this case is more akin to *Calderon*, where the court found: "[t]o infer HUD's knowledge is to draw an inference in the moving party's favor from a heavily disputed set of facts … The extent of HUD's knowledge is thus still up for grabs; that issue was not suitable for summary judgment." *Id.*, 70 F.4th at 978. Because there are issues of fact as to the extent of CHA's knowledge about Pangea's rent practices, summary judgment is inappropriate.

### 1. *Burns's Testimony as CHA's Rule 30(b)(6) Witness*

Pangea objects to many of Burns's statements for lack of foundation and as speculative and conclusory. *See* [105] ¶¶ 5–9, 12, 36, 38. But Burns testified as the Rule 30(b)(6) witness for the CHA, and such a witness can testify "not only to matters within his personal knowledge but also to matters known or reasonably available to the organization." *PPM Finance, Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894–95 (7th Cir. 2004). Pangea has not argued that the matters about which Burns testified were not "known or reasonably available" to CHA.

Pangea also argues that Burns's deposition testimony was "conclusory" and that she did not cite evidence to support her statement that CHA relied on the Owner's Certifications. [103] at 9–10. Likewise, Pangea believes that Burns's testimony that if the CHA knew a landlord was falsely certifying an Owner's

Certification it would not continue making housing assistance payments is conclusory and speculative so it cannot "defeat summary judgment." *Id.* at 10. I disagree. A corporate representative can testify about what the organization would do as a matter of course, including whether it relied on information in documents submitted to it, and how false information would change the organization's behavior. To establish whether an omission is capable of influencing a payment decision, testimony about a hypothetical scenario in which there was disclosure is to be expected and is admissible when based on a witness's knowledge of the decision-making process. Testimony can be too conclusory to be admissible at summary judgment, *see Foster v. PNC Bank, N.A.*, 52 F. 4th 315, 320 (7th Cir. 2022), but here Burns's role in the case and status as a Rule 30(b)(6) deponent suffice to admit her testimony about how CHA used Owner's Certifications and what CHA would do if it knew Owner's Certifications were false.

Finally, Pangea argues that Burns's testimony does not raise an issue of material fact because even if "CHA did not finally determine whether Pangea's certifications were false [that] does not prove that CHA relied on the accuracy of those certifications." [103] at 11. Reliance is different than materiality. *See United States v. Wells*, 519 U.S. 482, 501 (1997) (Stevens, J., dissenting). A false claim can be material "if a reasonable [person] would attach importance to it," *Calderon*, 70 F.4th at 976, even if a recipient did not actually rely on the misinformation. *See United States ex rel. Longhi v. United States*, 575 F.3d 458, 469 (5th Cir. 2009) (FCA materiality only requires proof that the false statements had the potential to

16

influence government's decision, not proof that they actually did); *see also United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (statement can be material even if the decisionmaker fails to appreciate its significance). Muhawi is not required to prove that CHA relied on the accuracy of Pangea's certifications (although such evidence is probative of materiality), and Burns's testimony suffices to raise a genuine factual dispute over CHA's knowledge of the falsity of Pangea's representations.

### 2. *Muhawi's Prior Filings*

Pangea argues that Muhawi's second amended complaint and motion for leave to file the second amended complaint admit that CHA knew Pangea was charging more for assisted units than comparable unassisted units and continued to make housing assistance payments anyway. [68] at 10–11. Statements in earlier pleadings are not judicial admissions. *See 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002). A statement in a prior pleading can be offered as evidence of the facts contained therein, but "the amending party may offer evidence to rebut its superseded allegations." *Id*. In this case, Muhawi has offered evidence to rebut his prior allegation that CHA knew of Pangea's false statements and continued making payments, thereby creating an issue of fact. That differentiates this case from *Orgone Cap. III, LLC v. Daubenspeck*, where the plaintiffs had not alleged any new facts and just deleted the prior allegations. *Id*., 912 F.3d 1039, 1048–49 (7th Cir. 2019).

The same is true for the statements in Muhawi's motion to file an amended complaint. In his motion for leave to file a third amended complaint, Muhawi said

that he learned new information about the CHA which changed his theory of the case. *See* [56] at 2. A litigant can adjust his strategy when he encounters new information. Whether that change undermines his credibility (assuming he is competent to offer any testimony about CHA's knowledge) is a decision for a factfinder and inappropriate at this stage of litigation.

### B. Materiality

In addition to the dispute of fact over whether CHA knew of Pangea's false claims when it made payments, the evidence in the record does not lead to a conclusion that, as a matter of law, Pangea's false certifications were immaterial. The fact that a government entity made a payment while knowing that the defendant violated a requirement is "strong evidence" that the requirement is not material, but it is not dispositive. *See Escobar*, 579 U.S. at 195; *Prose*, 17 F.4th at 743.[13] Evidence of materiality can also come in the form of a defendant's knowledge of the importance of regulatory compliance. *Escobar*, 579 U.S. at 181. There is evidence that Pangea did not want the CHA to find out about the rents it charged to assisted and unassisted units, [105] ¶¶ 15–16, which could lead a reasonable jury to infer that Pangea thought the requirement was important to the CHA. *See United States ex rel. Heath v.*

---

[13] Pangea states "To meet the strict materiality standard, plaintiff must show that the violations at issue are 'so central … that the government would not have paid these claims had it known of these violations.'" [68] at 10. The portion of *Escobar* quoted by Pangea is not its holding. The Court noted an allegation "that [defendant] misrepresented its compliance with mental health facility requirements that are so central … that the Medicaid program would not have paid these claims had it known of these violations." *Escobar*, 579 U.S. at 196. The Court continued, "Respondents may well have adequately pleaded a violation of § 3729(a)(1)(A). But we leave it to the courts below to resolve this in the first instance." *Id.* *Escobar* does not impose a requirement that in order to be material the government would have to stop making payments as soon as it had knowledge of the false statements.

*Wisconsin Bell, Inc.*, 75 F.4th 778, 788 (7th Cir. 2023) ("A jury might also reasonably infer that the importance of this rule was in fact understood by those who wanted to leave it undisturbed as a 'sleeping dog,' anticipating that if this dog woke up, it might bark or even bite."). A reasonable jury could conclude that Pangea knew that the CHA considered the prohibition on disparate rents to be important. A determination of materiality can include consideration of the defendant's knowledge that the government considered the requirement material, so judgment on the issue of materiality is premature.

Even if the CHA knew of Pangea's false claims, it could have other reasons for the decision to continue payments to Pangea, such as keeping voucher holders safely housed; those reasons are relevant to an ultimate conclusion on materiality. *See Prose*, 17 F.4th at 744 ("Many things could explain the government's continued contracting with Molina … it may have needed time to work out a way not to prejudice Medicaid recipients who had nothing to do with this problem.") (finding materiality adequately alleged on motion to dismiss); *see also United States ex rel. Aldridge v. Corp. Mgmt., Inc.*, 78 F.4th 727, 737–38 (5th Cir. 2023) ("[T]he Government contends that various circuits have recognized valid reasons why an agency may continue to pay claims despite allegations of fraud without defeating materiality—for example, public health and safety … such is the case here where it was important for potential patients of SCH to continue to have access to healthcare. For these reasons, the Government maintains, its 'pay and chase' approach does not neutralize the evidence supporting the jury's finding of materiality. We agree."). Pangea's false certifications

19

about rent disparities may not have been material. But that decision should be made by a fact finder. The record produced here does not entitle Pangea to judgment as a matter of law on materiality.[14]

## C. Pangea's Response to the Third Amended Complaint

Pangea responded to the Third Amended Complaint by filing a motion for summary judgment and failed to file a responsive pleading. Muhawi argues this means that Pangea admitted the allegations in the Third Amended Complaint. [95] at 14. First, the case upon which Muhawi relies, *Modrowski v. Pigatto*, did not hold that filing a summary judgment motion before an answer concedes the complaint's allegations. *Id.*, 712 F.3d 1166, 1170 (7th Cir. 2013). That could be a consequence, but the court declined to make a decision on the issue. *Id.* at 1170. Second, by filing a motion for summary judgment that contains factual assertions that contradict at least some of the allegations in the Third Amended Complaint, Pangea has put Muhawi on notice that it intends to deny those allegations. *See Edelman v. Belco Title & Escrow, LLC*, 754 F.3d 389, 394–95 (7th Cir. 2014) ("The purpose of a responsive pleading is to put everyone on notice of what the defendant admits and what it intends to contest.").

Pangea has leave to file an answer to Muhawi's Third Amended Complaint. While Pangea took a risk in filing for early summary judgment without formally denying the complaint's allegations, the litigation is better served through the

---

[14] Muhawi argues "materiality" should be determined by reference to the federal government's pay decision, not just the CHA's. *See* [95] at 15. Because I find that issues of fact regarding CHA's knowledge prevent judgment as a matter of law, I do not reach the issue.

narrowing of issues achieved by filing an answer. Muhawi has not been prejudiced by Pangea's failure to file a response because Pangea's motion for summary judgment put him on notice as to at least some of what Pangea would contest.

## IV.    Conclusion

Pangea's motion for summary judgment, [67], is denied. Pangea has until October 19, 2023, to file an answer to the Third Amended Complaint. The parties shall file a joint status report with a proposed case schedule by October 26, 2023.

ENTER:

Manish S. Shah
United States District Judge

Date: September 28, 2023